## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## EASTERN DIVISION

| | | |
|---|---|---|
| **WILLIAM H. DURHAM, M.D.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | |
| **ANKURA CONSULTING GROUP, LLC** | ) | **CIVIL ACTION NO.2:20-CV-112-KS-MTP** |
| **and JOHN DOES 1-5** | ) | |
| | ) | |
| **Defendant.** | ) | |

### ANKURA CONSULTING GROUP, LLC'S OMNIBUS MOTION IN LIMINE

COMES NOW Defendant, Ankura Consulting Group, LLC ("Ankura" or "Defendant"), by and through undersigned counsel of record, Balch & Bingham LLP, and files this Omnibus Motion in Limine, and would show unto the Court that the following matters are inadmissible as evidence in this litigation and should be excluded at trial:

**1.     Testimony, evidence, references, or argument that a claim submitted to the Trusts must be supported by an x-ray read by a NIOSH certified B-reader.**

Ankura anticipates that Plaintiff, William H. Durham, MD ("Dr. Durham"), will attempt to introduce testimony or argument that a claim submitted to the Trusts ***must*** be supported by an x-ray read by a "NIOSH certified B-reader." *See* Deposition of William H. Durham, attached as **Exhibit A**, at p. 306:19-22 ("Q. All right. But for all the other asbestosis claims, you do need a B-read, is your understanding? A. That's my understanding."); *id.* at 360:19-22 ("Q. Is that the B-reader's job, is to help the worker? A. Well, without the worker having a positive B-read, they don't get their claims paid."); Deposition of Gene Hortman, attached as **Exhibit B**, at pp. 51:24-52:9 ("Q. No. I'm talking about interpreting x-rays. You are not suggesting that you have got to be a B-reader to interpret the x-ray now, are you? A. To get a Trust claim, that's our understanding …. That's just my understanding. I don't know if I got it from the TDPs or what."). Dr. Durham has repeatedly made this assertion in an attempt to elevate his status as a "NIOSH certified B-

reader" within the asbestos trust claims process.

As Ankura explained in its summary judgment filings, the notion that a "NIOSH certified B-reader" is required to support a claim submitted to the Trusts is demonstrably false, except in one limited circumstance not at issue in this litigation. [Dkt. 203, p. 6]. The court-approved Trust Distribution Procedures ("TDPs") set forth the process for the payment of claims submitted to the Trusts. As unambiguously stated in the TDPs, a claim submitted to the Trusts can be supported by a "chest x-ray read by a qualified B-reader *or* other Qualified Physician …." *See*, *e.g.*, Amended and Restated WRG Asbestos PI Trust Distribution Procedures ("WRG TDPs"), attached as **Exhibit C**, at p. 27 n.6. (emphasis added). A "Qualified Physician" under the TDPs includes any board-certified physician in one or more specialized fields of medicine such as "pulmonology, radiology, internal medicine or occupational medicine." *Id.*

Because the overwhelming majority of claims submitted to the Trusts can be supported by an x-ray read by a physician other than a B-reader (and all but .4% of all B-reads relevant to this case), the Trusts' audit program is designed to evaluate  the baseline issue of whether a physician can reliably distinguish between a healthy or diseased lung, and not whether a B-reader can properly classify disease profusion levels on an ILO form (as only B-readers are trained). *See* Declaration of Gary Wingo, attached as **Exhibit D**, at ¶ 28. For this reason, the Audit Procedures *require* Ankura to use "a board certified pulmonologist approved by the Trustees … [to] review x-ray films" when conducting its auditing functions. *See* Audit Procedures, attached as **Exhibit E**, at p. 7. That pulmonologist does not have to be a B-reader. *Id.*

Accordingly, Ankura objects to any evidence, testimony, or argument stating or implying that a claim submitted to the Trusts *must* be supported by an x-ray read by a NIOSH certified B-reader. Such testimony would be objectively false. Therefore, such testimony would be irrelevant

and immaterial to the claims at issue, and confusing and misleading to the jury. *See Fed. R. Evid.* 401, 402 & 403.

    **2.**    **Testimony, evidence, references, or argument that Ankura was required to audit Dr. Durham using a "panel" of NIOSH certified B-readers.**

Ankura anticipates Dr. Durham will attempt to introduce testimony or argument that Ankura was required to audit him using a panel of "two or more NIOSH certified B-readers." Such anticipated testimony, yet again, emanates from Dr. Durham's attempt to elevate his status as a "NIOSH certified B-reader" and interject standards into the case that objectively do not apply.

This issue is also governed by the TDPs and the Audit Procedures, neither of which require the Trusts, nor Ankura, to use a NIOSH certified B-reader to audit physicians, much less a panel of two or more of them. Ankura audits physicians (including B-readers and other Qualified Physicians) on their ability to distinguish between a healthy or diseased lung, and not whether the physician has properly classified a specific disease profusion level on an ILO form. Ex. D. In fact, as discussed above, Ankura was ***required*** under the Audit Procedures to use a "board-certified pulmonologist approved by the Trustees … [to] review x-ray films" when performing its auditing functions. Ex. E, p. 7. That pulmonologist is not required to be a B-reader. *Id.*

Dr. Durham is expected to rely on testimony from Dr. Kenneth D. Krone, a B-reader who, like Dr. Durham, is engaged by law firms to provide medical evidence in support of claims submitted to the Trusts. Dr. Krone stated in his Rule 26 report that he is "aware of the NIOSH/CDC protocol for the final determination of disputed B-Readings of an ILO subtle profusions of 0/0, 0/1, and 1/0. The process requires a consensus reading by a panel of three unbiased B-Readers." *See* July 28, 2021 Report of Dr. Kenneth D. Krone, attached as **Exhibit F**, at ¶ 2.[1] Dr. Krone

---

[1] Ankura has cited to the reports Plaintiff's experts, Dr. Krone and Ralph Summerford, in this Motion to show what Ankura anticipates Dr. Durham will attempt to introduce at trial. Ankura has moved to exclude the testimony of both [Dkts. 206 and 208] and maintains that neither should be allowed to testify.

disavowed that statement, testifying during his deposition that he was not aware of any specific NIOSH rule that actually requires that procedure. *See* Deposition of Dr. Kenneth D. Krone, attached as **Exhibit G**, at 71:5-11:Q. Okay. Well, I find it interesting because I've read your reports and I've read Dr. Durham's filings, and there is a suggestion that there was some requirement that a dispute between two B Readers be resolved by a third B Reader pursuant to some rule, and I want to know what rule that is? A. I see. I don't know that rule."). Dr. Durham then attempt to amend Dr. Krone's opinions in a supplemented expert report of October 25, 2021 to state that "NIOSH requires you to have two or more certified B-Readers reviewing disputed chest x-rays …." *See* October 25, 2021 Supplemental Report of Dr. Kenneth D. Krone, attached as **Exhibit H**, at ¶ 30. Dr. Krone then submitted an August 15, 2022 affidavit in which he – for the first time – purported to identify a NIOSH guideline supporting his testimony. This guideline – on its face – is actually a process that relates to epidemiological studies, of which Ankura's audit indisputably is not.[2] *See* Affidavit of Kenneth D. Krone, attached as **Exhibit I**, at ¶ 9.

The aforementioned testimony should be excluded because it is premised upon the erroneous notion that NIOSH standards applied to Ankura's audit. NIOSH standards are irrelevant to the audit of Dr. Durham. The audit of Dr. Durham was governed by the court-approved TDPs and the Audit Procedures. The TDPs authorize audits of physicians who submit medical evidence to the Trusts and the Audit Procedures set forth the mechanics of the audit. The Audit Procedures *required* Ankura to audit physicians, whether B-readers or other Qualified Physicians, using a board certified pulmonologist. Neither the Trust Advisory Committee (TAC), Future Claims Representative (FCR), nor the Trustees, all of whom expressly approved the Audit Procedures, required anything more or different. Had those entities – vested by the bankruptcy court with the

---

[2] Dr. Krone's August 15, 2022 affidavit actually constitutes an untimely supplemental report. Ankura has a pending motion to strike the affidavit. [Dkt. 262].

authority to make such decisions – wanted NIOSH standards to apply, they could have required them. But they did not, and Ankura has no authority or ability to countermand that decision.

In short, Ankura followed the requirements of the Audit Procedures by using a board certified pulmonologist, Dr. David Pearse, to audit Dr. Durham (as well as hundreds of other physicians who submit medical evidence to the Trusts). Ex. E, p. 7. Testimony that Ankura should have employed procedures beyond what the Audit Procedures require should be excluded from evidence as irrelevant and immaterial. By definition, Ankura could not have acted with malice if it conducted its audit consistent with the TDPs and Audit Procedures.

Finally, to the extent the anticipated testimony would have any probative value, it should be excluded under *Fed. R. Evid.* 403 because its probative value would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Dr. Durham's repeated citation to, and reliance upon, "NIOSH standards" is simply a red-herring intended to confuse and/or mislead the jury. Again, the Trusts' audit program is governed by the TDPs and the Audit Procedures, which Ankura is contractually and legally required to follow. Objectively false testimony or argument that Ankura was required to follow any other procedures would be unfairly prejudicial to Ankura and would serve only to confuse and/or mislead the jury.

   **3.    Testimony, evidence, references, or argument that the four-point scale used by Ankura's medical experts is not certified or sanctioned by NIOSH, including the July 27, 2018 email in which Gary Wingo stated that the four-point scale "is not based on medical protocols per se."**

Ankura anticipates that Dr. Durham will attempt to introduce evidence or argument that the four-point scale used by the Trusts' medical experts to evaluate x-ray reads is not certified or sanctioned by NIOSH. Ankura further anticipates that Dr. Durham will attempt to enter into evidence a July 27, 2018 email in which Gary Wingo, an employee of Ankura, stated that "[o]ur

5

scoring system was developed by the Trustees and TAC, not based on medical protocols per se." *See* July 27, 2018 Gary Wingo email, attached as **Exhibit J**. [3]

When evaluating the admissibility of this evidence, it is important to recognize that Dr. Durham is criticizing Ankura for something over which it had no control. Specifically, Ankura had no discretion or authority to direct the Trusts' medical experts to use anything other than the four-point scale set forth in the Audit Procedures. The Audit Procedures were, as Mr. Wingo correctly states, developed and approved by the Trustees, TAC, and FCR. Ankura, therefore, was required to use the scale and had no discretion otherwise. Accordingly, Ankura's use of the four-point scale cannot be probative of any issue that is to be tried, including malice.

Second, and as discussed above, Dr. Durham's continued citation to (alleged) NIOSH standards is a red-herring, the intent of which is to confuse and/or mislead the jury. Again, Dr. Durham was not audited on his ability to classify profusion levels on an ILO form. Ankura audits physicians – both B-readers and other Qualified Physicians – on the baseline issue of whether they can reliably distinguish between a healthy or diseased lung. Ex. D, ¶ 28. NIOSH's profusion classification system has nothing to do with that determination.

For these same reasons, Dr. Durham should be precluded from offering into evidence the July 27, 2018 email in which Gary Wingo, an employee of Ankura, stated that "[o]ur scoring system was developed by the Trustees and TAC, not based on medical protocols per se." Ex. J. Dr. Durham has used that email to suggest that the four-point scoring system is somehow flawed or nefarious because it is not based on "medical protocols, per se." *See* Expert Report of Ralph Summerford, attached as **Exhibit K**, at p. 13 (citing Ankura's retention of medical experts "to read and evaluate x-rays using a non-NIOSH four-point scoring system that was not based on medicine,

---

[3] Portions of this document are subject to Ankura's Motion Requesting that Exhibits be Filed Under Restricted Access or for Continued Protection. *See* Dkt. 275 at pg. 12, ACG-ID-0005462.

per se" as an example Ankura's alleged failure to "maintain objectivity in discharging their professional responsibilities within the scope of the fraud examination."). While that is actually inaccurate, and outside the scope of Mr. Summerford's expertise, the salient point is that Ankura was **_required_** to use the scoring system. Any attempt to use another scoring system, including one "sanctioned" by NIOSH, would itself have been impermissible. Given that the four-point scale is included in the Audit Procedures, Ankura's use of that scoring system (and the related issues of how the scale was developed and/or whether it is based on medical protocols) cannot, as a matter of law, be probative of any issue to be tried, including the issue of malice. Therefore, the admission of such evidence would serve only to confuse and/or mislead the jury. *See Fed. R. Evid.* 401, 402 & 403.

### 4. Testimony, evidence, references, or argument that Ankura had a duty to audit Dr. Durham on his alleged ability and competence for providing the additional medical services of performing medical exams or preparing cancer causation link letters.

Dr. Durham and his witnesses have repeatedly asserted that Ankura is liable to him because, in addition to no longer accepting Dr. Durham's x-ray reads, the Trusts exercised their discretion to no longer accept any medical evidence from Dr. Durham, including medical exams and cancer link letters. Dr. Durham contends that, because he was not audited on his ability to conduct medical exams or write cancer link letters, the decision to no longer accept such reports from him is improper. He attempts to impute that decision to Ankura, even though it was the Trusts' decision to no longer accept such evidence. Such testimony and/or arguments should be excluded from evidence.

Section 5.8 of the TDPs provides:

**5.8 Claims Audit Program:** The PI Trust, with the consent of the TAC and the Futures Representative, may develop methods for auditing the reliability of medical evidence, including additional reading of X-rays, CT scans and verification of

7

17319729.52

pulmonary function tests, as well as the reliability of evidence of exposure to asbestos …. In the event that the PI Trust reasonably determines that any individual or entity has engaged in a pattern or practice of providing unreliable medical evidence to the PI Trust, it may decline to accept additional evidence from such provider in the future.

….

Ex. C, p. 47, § 5.8

The TDPs expressly state that in "the event that the PI Trust reasonably determines that any individual or entity has engaged in a pattern or practice of providing unreliable medical evidence to the PI Trust, it may decline to accept additional evidence from such provider in the future." *Id.* If the Trusts – not Ankura – deem a physician unreliable based on an audit of x-rays, the Trusts have the discretion to reject all medical evidence from that physician, including medical exams and cancer link letters.[4]

Once Dr. Durham had been deemed unreliable, the Trusts not only had the discretion to decline to accept any medical evidence from him, they arguably had the duty to do so. This is because the TDPs do not permit the Trusts to make a payment to a claimant unless and until they have "reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical standards." *Id.* at p. 43, § 5.7(a)(2). It stands to reason that the Trusts could not have "reasonable confidence that the medical evidence provided in support of the claim is credible" if the evidence was submitted by a physician with a demonstrated propensity for submitting unreliable medical evidence such as Dr. Durham.

---

[4] In fact, while most of TDPs at issue in this litigation are consistent with the WRG TDPs cited above, the Fifth Amended and Restated Asbestos Personal Injury Claims Resolution Procedures of The Celotex Corporation trust *require* that particular trust to reject all medical evidence from an unreliable physician. *See* Fifth Amended and Restated Asbestos Personal Injury Claims Resolution Procedures of The Celotex Corporation, attached as **Exhibit L**, at p. 18, § 7.3 ("If its audits show an unacceptable level of reliability for medical evidence submitted by specific doctors …, the Trust *shall* refuse to accept medical evidence from such doctors or facilities.").

Setting the TDPs aside, Dr. Durham's theory regarding medical exams and cancer link letters suffers from a more obvious flaw: it was the Trusts, not Ankura, that made the decision to no longer accept any medical evidence from Dr. Durham. While Ankura does not dispute that it provided – at the Trusts' request and direction – data and input related to its audit of Dr. Durham, Dr. Durham cannot ignore the legal and practical distinction between the Trusts and Ankura and impute to Ankura a decision it did not make.

Dr. Durham should be precluded from offering evidence and/or argument that Ankura is somehow liable for the Trusts' decision to no longer accept his medical exams and cancer link letters. The TDPs give the Trusts the absolute discretion to reject all medical evidence from a physician who has engaged in a pattern or practice of submitting any form of unreliable medical evidence. The Trusts (and not Ankura) did precisely that with respect to Dr. Durham. Accordingly, any evidence or argument inconsistent with the TDPs, such as the contention that Ankura is liable for the Trusts' decision to no longer accept any medical evidence from Dr. Durham, should be excluded as irrelevant and immaterial to this litigation. The evidence should also be excluded because its admission would be unfairly prejudicial to Ankura and confusing and/or misleading to the jury. *See Fed. R. Evid.* 403.

>    **5.      Testimony, evidence, references, or argument that constitute evidence of alleged negligence against Ankura, including, without limitation, testimony that Ankura did not act "reasonably," "equitably," or "fairly."**

Dr. Durham attempts to interject a negligence standard into this intentional tort case, including through his contention that Ankura had a duty to act "reasonably" (or "equitably" or "fairly") with respect to the audit of Dr. Durham. *See* [Dkt. 237, p. 16] ("[i]n this lawsuit, Defendant Ankura bears the burden to show that the audit methods it used against Dr. Durham adhered to approved methods to which TAC and FCR 'consented' to its use, and that Ankura's

17319729.52

determination that Dr. Durham had engaged in a pattern or practice of providing unreliable medical evidence to the PI Trust was 'reasonably determined.'"); [*id.* at p. 23] ("Ankura apparently never expected to be called upon to show cause that it made the predict [sic] findings reasonably and be called upon to pay damages, if it did not act reasonably …. Dr. Durham is here for his day in court to show that Ankura did not make the predicate findings 'reasonably' ….); [*id.* at p. 7] ("…. Ankura's use of mystery reports from secret doctors to deny claims is neither fair nor equitable …. That does not seem to be a reasonable and judicious process."); [*id.* at p. 5] ("It is inexcusable not to do it fair and right by using at least more than one currently certified B-Reader ….").

Dr. Durham has two pending claims – a claim for tortious interference with contracts and a claim for tortious interference with business relations. His negligence claim was dismissed. The "general theory" of Dr. Durham's case, as pleaded in the Second Amended Complaint, is that Ankura engaged in a "sham" audit of Dr. Durham in which it, with a malicious intent to fail him, designed an audit consisting solely of 44 x-rays in which 22 were "cherry picked" because of their "subtle low '1/0 profusion' radiographic findings of opacities (dust particles) in either the bilateral lower zones of the lungs only …." [Dkt. 165, ¶ 8]; *see also* [*id.* at ¶¶ 9, 20, 48, 55, 64].

Notwithstanding his pleadings, Dr. Durham has made it abundantly clear he will attempt to prove his tortious interference claim with evidence that Ankura's audit was not "reasonable," "equitable," or "fair" to Dr. Durham. This includes anticipated testimony that Ankura breached a duty, pursuant to § 5.8 of the TDPs, to "reasonably determine" that Dr. Durham engaged in a pattern or practice of providing unreliable medical evidence.

Dr. Durham should be precluded from offering such evidence and/or argument. Dr. Durham's burden is to establish the elements of a tortious interference claim, which requires him to prove malice. Section 5.8 of the TDPs does not alter that burden. Section 5.8 provides that if,

after an audit of a physician or law firm, "the **_PI Trust_** reasonably determines that any individual or entity has engaged in a pattern or practice of providing unreliable medical evidence to the PI Trust, **_it_** may decline to accept additional evidence from such provider in the future." Ex. C, p. 47, § 5.8 (emphasis added).

Section 5.8 gives the Trusts – not Ankura – the discretion to deem a physician unreliable and to decline to accept medical evidence from an unreliable physician. Dr. Durham, however, elected not to sue the Trusts. Regardless, Dr. Durham cannot accomplish through Ankura what he is unwilling or unable to do via the Trusts. If Dr. Durham wanted to assert a violation of the TDPs and believed he had standing to do so, he should have sued the Trusts in the appropriate jurisdiction.

In short, Dr. Durham should be precluded from offering evidence or argument that Ankura failed to conduct a "reasonable," "fair," or "equitable" audit. These terms apply to a negligence claim. This is an intentional tort case. Dr. Durham's burden is to prove the elements of a claim for tortious interference with contracts and/or business relations. These torts cannot be proven with evidence of alleged negligence, and permitting Dr. Durham to argue otherwise will serve only to confuse and mislead the jury about what he is required to prove in order to prevail. *See King's Daughters and Sons Circle No. Two of Greenville v. Delta Regional Medical Center*, 856 So. 2d 600, 606 (Miss. Ct. App. 2003) ("…. negligent interference is no cause of action at all."); *Jordan v. Wilson*, 5 So. 3d 442, 447 (Miss. Ct. App. 2008) ("an intentional tort cannot be committed negligently."). Section 5.8 of the TDPs does not lesson Dr. Durham's burden. The evidence should excluded.

**6.      Testimony, evidence, references, or argument regarding the processing of claims supported with medical evidence from Dr. Durham after the Trusts made the decision to no longer accept Dr. Durham's reports, including the allegation that Dr. Durham's x-ray readings were no longer accepted**

**"retroactively" and that claimants were damaged.**

Ankura anticipates that Dr. Durham and his witnesses will attempt to introduce testimony, evidence, references, or argument regarding the treatment of claims by the Trusts after the Trusts made the decision to no longer accept his medical reports, including testimony, evidence, references, or argument that Dr. Durham's x-ray readings were no longer accepted "retroactively." *See* Affidavit of William H. Durham, attached as **Exhibit M**, at ¶ 8 ("Also, most disturbing to me is that the wrongful banning of my reports was done retroactively, wrongfully hurting 6,000 plus claimants, many with lung cancer."); Ex. K ("As a result of their unreliable work and failure to meet the standard of care of a CFE, the Ankura CFEs failures and recommendations damaged not only the Plaintiff, but the approximate 34 law firms who filed claims for their client claimants, as well as the entire population of the estimate 7,000 claimants representing approximately 83,000 claims.").

Such testimony, evidence, references, or argument has no relevance or materiality to the claims at issue. Just like it was at all times the Trusts' decision to no longer accept reports from Dr. Durham, it was also, at all times, the Trusts' decision on how to handle pending claims that relied on medical evidence from Dr. Durham. Moreover, this lawsuit alleges that Ankura intentionally and maliciously designed an audit to fail Dr. Durham. In addition to having the burden to prove all other elements of his causes of action, it is Dr. Durham's burden to establish that *he* suffered damage. The impact of the Trusts' decision on non-parties, *e.g.* pending claimants, has no bearing on that analysis. Dr. Durham does not have standing to assert the alleged injuries to non-parties as his own.

Finally, to the extent the anticipated testimony would have any probative value, it should be excluded under *Fed. R. Evid.* 403 because its probative value is substantially outweighed by the

danger of unfair prejudice, confusion of the issues, or misleading the jury. Dr. Durham clearly wants to argue impact on others in hopes of drawing sympathy from the jury for non-parties such as claimants seeking compensation from the Trusts. This is entirely improper and is rife with danger of prejudice, confusion, and misleading the jury. Invoking the passions of the jury is improper. Dr. Durham wants to make this case about individuals other than himself. This should not be allowed.

7.   **Testimony, evidence, references, or argument regarding the effect that the Trusts' decision to no longer accept reports from Dr. Durham had on people and/or entities other than Dr. Durham, including on claimants, law firms, his medical transcriptionist, PFT companies, x-ray companies, Dr. Durham's nurse, etc.**

Ankura anticipates that Dr. Durham will attempt to introduce testimony, evidence, or argument regarding the alleged effect that the Trusts' decision had not only on Dr. Durham, but also a myriad of other people and entities, including claimants, law firms, Dr. Durham's transcriptionist, PFT companies, x-ray companies, etc. *See* Ex. A, at p. 480: 13-24 ("A. "The asbestos world" there means it started with me when they banned me.  Then it trickled down to the 30-plus law firms that I had worked for. Then it trickled down to almost 7000 injured workers, for which at least 2000 of them have lung cancer, mostly African-American. Then it trickled down to my 76-year-old medical transcriptionist. Then it involved the PFT companies going out of business. Then it involved the x-ray companies going out of business.  And my nurse is at home not working.  She's older. And so it affected a lot of people."). Dr. Durham's counsel advanced this type of argument before this Court at the summary judgment hearing. *See* Excerpt of hearing on Summary Judgment Motions, attached as **Exhibit N**, p. 60: 2-7 ("But we're talking about ... almost 7,000 claims. Yes, it's going to take years for all these people to get new X-rays and find a

new B Reader that's willing to work with lawyers who represent the injured worker to be processed.").

Similar to topic #6 above, evidence regarding any negative effects that Dr. Durham suggests were suffered by individuals and entities other than himself is wholly irrelevant, and thus inadmissible. *Fed. R. Evid.* 402. In this case, along with multiple other elements, Dr. Durham's burden is to establish that *he* suffered damage. Whether non-parties were impacted by the Trusts' decision simply has no bearing on that analysis. Again, Dr. Durham has no standing to assert these alleged injuries as his own.

Further, to the extent the anticipated testimony would have any probative value, it should be excluded under *Fed. R. Evid.* 403 because its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Dr. Durham clearly intends to introduce evidence and arguments designed to draw sympathy from the jury for non-parties such as claimants seeking compensation from the Trusts, including the gratuitous suggestion (without evidence no less) that they are "mostly African-American" and that there are "many with lung cancer." This is entirely improper and is rife with danger of prejudice, confusion, and misleading the jury. There is no evidence that these claimants cannot seek compensation from the Trusts (because they can), only that they cannot support a claim based on medical evidence from Dr. Durham. Nor is there any evidence that the Trusts' decision regarding Dr. Durham nor its decision regarding how to treat pending claims had anything to do with race, age, or any other protected class. Invoking the passions of the jury, including through unfounded suggestions of prejudice, should not be allowed. This case is, and should remain, about Dr. Durham.

8. **Testimony, evidence, references, or argument that Dr. Durham is a "conservative" B-reader, that he is more "conservative" than other B-readers, and/or that he is a "great doctor."**

It is anticipated that Dr. Durham and his witnesses, including law firms for which Dr. Durham worked, will testify that Dr. Durham is a "conservative" B-reader, that he is more "conservative" than other B-readers, and/or that is a "great doctor." *See*, *e.g*., Excerpts of Deposition of Tony Sakalarios, Volume I, attached as **Exhibit O**, at 29:10-12 ("The most conscientious B-reader and medical provider that I've ever had in the 22 years is Dr. Durham."); *id.* at 32:11-13 ("I think he's a great doctor. I think he – I think he's one of the most conservative B-readers.").

Such testimony is not relevant or helpful to the jury as it is subjective opinion testimony that lacks any predicate or foundation. *See Fed. R. Evid.* 701; *see also DIJO, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679, 685 (5th Cir. 2003) (*Federal Rules of Evidence* 701 was amended in 2000 to prohibit lay witnesses from offering opinions based on 'scientific, technical, or other specialized knowledge within the scope of Rule 702' …. This foundational requirement helps to eliminate the risk that a party will circumvent the reliability requirements set forth in *Federal Rule of Evidence* 702 by adducing expert testimony in lay witnesses' clothing."); *Seibert v. Jackson County, Miss.*, 2015 WL 5039950, at *3 (Aug. 26, 2015 S.D. Miss) (Starrett, J.) (quoting *United States v. York*, 600 F.3d 347, 361 (5th Cir. 2010) ("Lay witnesses may not provide an opinion which 'requires specialized medical knowledge.'")).

Indeed, such "comparison" testimony, particularly by lay witnesses, begs the question of to whom is Dr. Durham is being compared, what standard is being used to make such a comparison, or what is meant by "conservative"?[5] For example, in addition to Dr. Durham, the law firm of Sakalarios, Blackwell & Schock, PLLC engaged Dr. Donald Breyer and Dr. Mark Klepper to read

---

[5] A "conservative" B-reader could easily be interpreted to mean one who is more inclined to mark disease on an x-ray where this is none.

x-rays. Dr. Breyer and Dr. Klepper, who Dr. Durham testified are "corrupt" B-readers, have also been deemed unreliable by the trusts. Therefore, any suggestion that Dr. Durham is more "conservative" as compared to those physicians would obviously be of little, if any, value.[6]

In short, neither Dr. Durham, his witnesses, nor his experts have undertaken any sort of statistical analysis to compare Dr. Durham's error rate to any other physician; therefore, they have no foundation upon which to compare him to any other B-reader or to opine that he is a "conservative" B-reader or a "great doctor" (whatever those terms mean).

Further, to the extent that such evidence has any relevance, the probative value of such evidence would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See Fed. R. Evid.* 403. The issue is not whether Dr. Durham is a "conservative" B-reader, a "great doctor," or even whether the Trusts' decision to disqualify Dr. Durham was correct; it is whether Ankura, acting with malice, intentionally designed an audit solely intended to fail Dr. Durham. Interjecting vague, unsubstantiated opinion testimony regarding Dr. Durham's perceived tendencies as a B-reader or as a doctor would serve only to confuse and/or mislead the jury as to the material issues in the case.

**9.**     **The September 29, 2018 email in which Ben Stewart, legal counsel to certain of the Trusts, conveyed the substance of a telephone conversation in which "Kathy Duhio, who works for [a law firm] .... told me that they had sent many cases to Dr. Durham and that he was one of the most conservative reviewers they use. They recently sent him 300 x-rays and he only found 40 positive results ...."**

Ankura anticipates that Dr. Durham will attempt to enter into evidence a September 29, 2018 email in which Ben Stewart, legal counsel to certain of the Trusts, wrote, in pertinent part, as follows:

.... Second, I received one phone call in response to the Durham letter. It was from

---

[6] Ironically, it would also be inaccurate, as Ankura's audit revealed that Dr. Durham actually had a medical error rate higher than either Dr. Breyer or Dr. Klepper.

> Kathy Duhio, who works with Gerald Maple's office. (He is a lawyer in New Orleans). She was very polite. She told me that they had sent many cases to Dr. Durham and that he was one of the most conservative reviewers they use. They recently sent him 300 x-rays and he only found 40 positive results. She said he was very good at contacting her if a patient had a severe issue that required immediate treatment. They have many pending Durham cases. She thought we should re-review the decision. I told her that we had performed a very thorough review, but that I would pass all of this along (which I am doing now).

*See* September 29, 2018 Ben Stewart email, attached as **Exhibit P**.

Mr. Stewart's email should be excluded from evidence for multiple reasons, as it perfectly embodies the problems highlighted in the preceding in limine topic. First, the document is rank hearsay. *See Fed. R. Evid.* 801 & 802. It is actually hearsay within hearsay. In the email, Ben Stewart, who is not an Ankura employee, memorializes an alleged telephone conversation with Kathy Duhio, an employee of a law firm with which Dr. Durham worked. In his email, Mr. Stewart recounts that Ms. Duhio allegedly stated during that telephone call that Dr. Durham is "one of the most conservative reviewers" used by the law firm. Accordingly, that email is the definition of hearsay. The email also lacks any predicate or foundation. It is nothing more than a vague, out-of-court (alleged) opinion of a lay witness that is unsupported by, and cannot be verified through, statistical analysis or other objective means. *See Fed. R. Evid.* 701; *see also DIJO, Inc.*, *supra.*; *Seibert*, *supra*.

For these same reasons, Ms. Duhio's hearsay statement that the law firm recently sent Dr. Durham "300 x-rays and he only found 40 positive results …." is also not probative of any material issue, much less of malice. There has been no determination (nor can there be a determination) that the (allegedly) 40 positive x-rays were actually positive and the 260 negative x-rays were actually negative for asbestos related disease. Regardless, even if Dr. Durham made the correct determination on all 300 x-rays referenced by Ms. Duhio, such a result have no relevance to whether the x-rays evaluated in the multi-faceted audit of Dr. Durham were maliciously selected

by Ankura, as pleaded in the Second Amended Complaint.

Finally, to the extent Ms. Duhio's email has any relevance, it should be excluded because its probative value would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See Fed. R. Evid.* 403. Again, interjecting vague, unsubstantiated opinion testimony regarding Dr. Durham's perceived tendencies as a B-reader via Ms. Duhio's hearsay email or otherwise would serve only confuse and/or mislead the jury as to the material issues in the case.

### 10. The November 21, 2016 email in which Gary Wingo, an employee of Ankura, wrote a remark involving Mississippi.

Ankura anticipates that Dr. Durham will attempt to enter into evidence a November 21, 2016 email in which Gary Wingo, an employee of Ankura, wrote a remark involving Mississippi. *See* November 21, 2016 Gary Wingo email, attached as **Exhibit Q**. Dr. Durham has contended that Mr. Wingo's email reflects a disparaging remark towards the state of Mississippi. The email has no relevance or materiality to the claims in this lawsuit. The only reason Dr. Durham would seek to admit this email is to inflame and anger the jury. The email is not relevant to the claims in this lawsuit and offering it to inflame the jury is clearly an improper purpose.

Moreover, even if the email had some negligible relevance (it does not), its probative value would be substantially outweighed by the danger of unfair prejudice and confusion of the issues, and the email is misleading to the jury. Again, Mr. Wingo's email would likely be highly inflammatory. However, this case should be decided on its facts and merits, and not whether the jury has a negative opinion of a litigant because of an off-hand informal comment by one of its employees regarding the state in which the jury resides. *See, e.g., Emmerich Newspapers, Inc. v. Particle Media, Inc*., 2022 WL 4360570, at *5 (Sept. 20, 2022 S.D. Miss) (statement that "could inflame the prejudices of the jury by pitting a 'small town' Mississippi company against a large

17319729.52

out-of-state corporation" inadmissible under *Fed. R. Evid.* 401-403); *Vela v. Estelle*, 708 F.2d 954, 962 (5th Cir. 1983) (evidence offered for the sole purpose of inflaming minds of the jury is inadmissible); *Garth v. RAC Acceptance East, LLC*, 2021 WL 4860466, at *4 (N.D. Miss. Oct. 18, 2021) (quoting *Learmonth v. Sears, Roebuck & Co.*, 631 F.3d 724, 732 (5th Cir. 2011) ("'A conscience-of-the-community argument is any impassioned and prejudicial plea intended to evoke a sense of community loyalty, duty and expectation.' Such argument is improper and will not be allowed during the trial in this case.")).

**11.    The July 21, 2018 email in which Marla Eskin, legal counsel to certain of the Trusts, made the statement that** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Ankura anticipates that Dr. Durham will attempt to enter into evidence a July 27, 2018 email in which Marla Eskin, legal counsel to certain of the Trusts, wrote as follows:



*See* July 27, 2018 Marla Eskin email, attached as **Exhibit R**.

As a preliminary matter, this email has been made part of Ankura's Motion Requesting that Exhibits be Filed Under Restricted View or for Continued Protection [Dkt. 275, pg. 10-11, ACG-ID-0004168] due, in part, to Dr. Durham's desire to use the document as a vehicle for an improper purpose. As the Motion is still pending, Ankura maintains its position that this document

17319729.52

should be subject to continued protection, and consistent with prior practice at the direction of the Court, Ankura has redacted the foregoing and will provide the Court with a copy of the pertinent document for review.

Dr. Durham has contended that Mrs. Eskin is representing as a statement of fact ███ ██████████████████████. It has even been suggested (in a not so subtle attempt to intimidate a potential witness) that Dr. Durham intends to file a complaint against Mrs. Eskin with the Delaware State Bar as a result of this email.

This email should be excluded from evidence for multiple reasons, beginning with the fact that it is hearsay. *See Fed. R. Evid.* 801 & 802. The email was drafted by Marla Eskin, legal counsel to certain of the Trusts. Mrs. Eskin is not employed by Ankura. She has never been employed by Ankura. While Ankura strongly disagrees that the email reflects any kind of misconduct by Mrs. Eskin, the relevant point is that it would be fundamentally unfair and improper for Dr. Durham to impute Mrs. Eskin's alleged misconduct – through a hearsay document, no less – to Ankura.

Not only is Mrs. Eskin not an Ankura employee, the email is irrelevant and immaterial to this litigation. The email had no bearing on the Trusts' decision to disqualify Dr. Durham. While the email was written the day before Mrs. Eskin wrote a letter to the law firm of Sakalarios, Blackwell, & Schock, PLLC advising the firm that the Trusts would no longer accept Dr. Durham's medical reports, the Trusts' decision regarding Dr. Durham had been made weeks before the email was sent. *See*, *e.g*., June 12, 2018 Minutes of the Owens Corning/Fibreboard Asbestos Personal Injury Trust Trustee Meeting, attached as **Exhibit S** (noting that Dr. Durham's "failure rate, as it had been with the previous expert retained by the Trust, was very high. Counsel will be notifying Dr. Durham that the Trust will no longer accept reports from him."). Accordingly, to suggest that Mrs. Eskin's email was a catalyst for the Trusts' decision to disqualify Dr. Durham defies reality.

17319729.52

More importantly, and regardless of its timing, Mrs. Eskin's email has absolutely no relevance to whether *Ankura* acted with malice with respect to Dr. Durham.[7]

Finally, to the extent that Ms. Eskin's email has any relevance, the probative value of the evidence would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See Fed. R. Evid.* 403.  Again, Ms. Eskin is legal counsel to certain of the Trusts. She is not an Ankura employee. It would be unfairly prejudicial to Ankura, and confusing and misleading to the jury, for Dr. Durham to attempt to impute Mrs. Eskin's alleged misconduct to Ankura.

### 12.    The June 29, 2018 email in which Ben Stewart, legal counsel to certain of the Trusts, discussed the reasonableness of the Durham audit.

Ankura anticipates that Dr. Durham will attempt to enter into evidence a June 29, 2018 email written by Ben Stewart, legal counsel to certain of the Trusts. Portions of that document have been made part of Ankura's Motion Requesting that Exhibits be Filed Under Restricted View or for Continued Protection [Dkt. 275, ACG-ID-0005747], therefore, Ankura will follow the same procedure as discussed with the prior email.

*See* June 29, 2018 Ben Stewart email, attached as **Exhibit T**.

This document is similar to the  email referenced in the previous *in limine* topic. This email, too, is a hearsay statement drafted by someone who is not employed by Ankura. *See Fed. R. Evid.* 801 & 802. Second, this email was sent on June 29, 2018, seven days after legal counsel for certain of the Trusts  had notified the Sakalarios, Blackwell, & Schock, PLLC law firm that the Trusts

---

[7]



"can no longer accept reports from Dr. Durham." *See* June 22, 2018 letter, attached as **Exhibit U**. The Trusts' decision regarding Dr. Durham had already been made when Mr. Stewart sent his email. Accordingly, the email is not relevant to any issue in the litigation, much less to the issue of whether Ankura acted with malice.

Third, the email should be excluded under *Fed. R. Civ. P.* 403, as any probative value of the email would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Dr. Durham focuses on the statement in Mr. Stewart's email wherein Mr. Stewart mentions the reasonableness of the audit. As explained above, however, the primary issue in this litigation is whether Ankura acted with malice. "Reasonableness" is a negligence concept. Dr. Durham has no negligence claim. Accordingly, the introduction of Mr. Stewart's email would serve only to confuse the jury and/or mislead the jury as to the applicable standard in the case.

13.     **Testimony, evidence, references or argument that amount to speculation about Ankura's intent and motives and/or that constitutes improper opinion testimony including, without limitation, testimony or argument that Ankura "hand-selected" or "cherry-picked" the 44 x-rays of the Tracing Study, that Ankura conducted a "dishonest" audit, that Dr. Durham was targeted because he was a high volume B-reader, that the "fix was in," and that Ankura acted "maliciously" or in "bad faith."**

Dr. Durham and certain of his witnesses, including Tony Sakalarios, Kenneth Krone, and Ralph Summerford, have testified to speculative statements about Ankura's intent and motives. Specifically, and without limitation, the aforementioned witnesses have testified (without personal knowledge and contrary to the established and undisputed facts) that Ankura "hand selected" or "cherry-picked" the 44 x-rays of the Tracing Study, that Ankura conducted a "dishonest" audit, that Dr. Durham was targeted because he was a high volume B-reader, that the "fix was in," and that Ankura acted "maliciously" or in "bad faith." *See, e.g*., Ex. M, at ¶ 5 ("I first realized that this

was a dishonest audit, when I learned that Ankura had Cherry Picked 44 problematic Durham x-rays …. So, I knew the fix was in."); *id.* at ¶ 6 ("This was highly irregular and certainly not utilized or approved by NIOSH or within any NIOSH B-Reader protocol that I have been tested on, yet Ankura wanted to unreasonably use this method. The fix was definitely in."); *id.* at ¶ 8 ("In my opinion, Ankura's 'chest x-ray audit' of me was to intentionally put my B-Reading Business out-of-business because I was a full time, high volume B-reader …."); *id.* at ¶ 18 ("Thus, I believe that Ankura's malicious [sic] targeted me because of my large volume in support of injured workers."); *id.* at ¶ 19 ("This necessarily means that Ankura did not even have an established unacceptable error rate four months earlier when Ankura recommended my banning – how irresponsible, malicious, and willful …."); *id.* at ¶ 20 ("I also believe their deletion had to be intentional because they were caught not having proper predication to even perform this Audit (i.e., willful malice)."); *id.* at ¶ 23 ("I do not believe that Ankura cared to do it right. Rather, it was conducted by design to maliciously falsely fail me."); *id.* at ¶ 24 (" ….[N]o one at Ankura cared to do it right. Ankura audited me in bad faith, but just did not think they would be found out."); Ex. K at p. 13 ("Molnar attempted to keep Dr. Pearse's identity concealed, likely because he is not a certified B-Reader."); *id.* at p. 14 ("Ankura knowingly excluded and deleted emails involving the Dr. Durham investigation."); Ex. O at 82:22-83:1, 83:8-10 ("…. [T]hey handpicked these 44 … this was not a random audit. It wasn't random by any stretch of the imagination. It was fixed from the beginning for him to fail …. It's just – you know, it's just so disheartening. It really is. The fix was in from the beginning with Ankura."); Ex. I at ¶ 11 ("Thus, I cannot help but conclude that not only did Ankura not "reasonably" determine that Dr. Durham had failed its audits of him, but, it audited Dr. Durham in bad faith, as it is readily apparent that Ankura willfully did not care to do it right."); *id.* at ¶ 14 ("It is no wonder Dr. Leviton's audit opinions differed from those of Dr. Durham

23

especially on these purposefully selected non-random problematic x-rays …. It appears that Ankura purposely selected an ultra-conservative, biased reviewing B-Reader to participate in its audit of Dr. Durham to all but guarantee the false failing result it wanted."); Ex. F at ¶ 18 ("This certainly was not random and was no coincidence. Such a forced sampling is indicative that Ankura wanted a 'failed' failse audit result for Dr. Durham."); *id.* at ¶ 22 ("…. I conclude that Ankura purposefully selected the 44 chest x-rays used in the B-Reader audit of Dr. Durham in a manner to all but guarantee Dr. Durham a false failed result, which is what happened as opposed to what you would expect from an unbiased intellectually honest audit.").

None of those witnesses has personal knowledge of the matters upon which they purport to testify. Accordingly, their speculative and unfounded statements about Ankura's intent and motives are entirely improper. *See Fed. R. Evid.* 602 & 701. *See also Ryan v. United States Dep't of Commerce*, 2021 WL 1080517, at *2 (S.D. Miss. March 18, 2021) (testimony is "inadmissible to the extent it is not based on personal knowledge, conveys hearsay, and speculates regarding others' motives and thoughts."); *U.S. ex rel. Wuestenhoefer v. Jefferson*, 2014 WL 7185428, *4 (N.D. Miss. Dec. 16, 2014) (quoting *In re Actos (Pioglitazone) Prods. Liab. Litig.*, 2014 WL 2921653, at *37 (W.D. La. June 23, 2104 for the proposition that "witness could not testify as to the reason company made decision when he 'did not attend the … meeting [and] was not involved in [the] decision."); *Ross v. Metropolitan Property and Cas. Inc. Co.*, 2008 WL 4696022, at *1 (S.D. Miss. Oct. 22, 2008) (testimony excluded because the court "will not permit any testimony that amounts to nothing more than unsubstantiated speculation concerning the motives of the individuals.").

Not only do those witnesses lack personal knowledge of these matters, their testimony is contradicted by the undisputed evidence. For instance, with respect to the 44 x-rays used in the

Tracing Study, notwithstanding the baseless testimony that the x-rays were "cherry picked" with the nefarious intent to fail Dr. Durham, the undisputed and uncontradicted testimony from multiple witnesses is that these x-rays were used for the Tracing Study because they were x-rays that Ankura had remaining from the 98 randomly selected x-rays of the Durham Medical Audit (sometimes referred to as the "Durham 100"). Not a single witness has testified that Ankura intentionally selected the 44 x-rays because many of them allegedly reflected disease at the low 1/0 profusion level or only in the lower lung zones. That simply did not happen. Likewise, there is no evidence that Dr. Durham was targeted because he was (allegedly) a "high volume" B-reader.

Regardless of the accuracy of the testimony, it is highly improper for a witness to speculate about the intent and motives of another party. That is particularly true when a witness invades the province of the jury, e.g., in this case, by testifying that Ankura acted with malice or in bad faith. *See Greenwood v. King*, 2011 WL 1457162, at *2 (S.D. Miss. April 12, 2011) (Starrett, J.) (quoting *United States v. Jackson*, 549 F.3d 963, 974 (5th Cir. 2008)) ("Ordinarily, the Court does 'not permit witnesses to speculate about a 'defendant's state of mind or intent' …. because intent is one of the ultimate issues for the jury."). Such evidence, including but not limited to the specific testimony referenced above, should be excluded.

> **14. Testimony, evidence, references, or argument that Ankura spoliated evidence by deleting emails, including testimony, evidence, references, or argument that regarding the intent of any deletion of emails.**

Ankura anticipates that Dr. Durham will attempt to introduce testimony, evidence, references, or argument that Ankura intentionally spoliated evidence by deleting emails. *See* Ex. M ¶ 20 ("I believe that is spoilage [sic] of evidence and I would like to see all those deleted emails about my audits. I also believe that their deletion had to be intentional because they were caught not having proper predication to even perform this Audit (i.e., willful malice).")

There is an email in this case from Dr. Andras Molnar, a member of the Ankura audit team, responding to a question for another member of the Ankura audit team, Gary Wingo. Dr. Molnar responds to Mr. Wingo's question, by stating in part, "[p]robably there is, but I don't have the emails, as we deleted almost all audit emails per the direction of Tom." Importantly, it is undisputed that any such direction to clean up audit related emails by Tom (Florence) took place in 2015 *at a different company than Ankura*, nearly three years before the Durham-related audits were completed and the Trusts elected to no longer accept reports from Dr. Durham, and almost five years before Dr. Durham filed this lawsuit. *See* Excerpt of Deposition of Gary Wingo, p. 269:7-9, attached as **Exhibit V**. At the time of the alleged communication, both Mr. Wingo and Dr. Molnar were employees of ARPC, not Ankura. Moreover, ARPC – and certainly not Ankura – was under no litigation hold at the time and it would be unreasonable to assume it should be.

Moreover, Dr. Durham and his counsel have twisted this email to suggest that Ankura deleted all "Durham audit" emails to cover up its lack of predication to audit him. *Id.* at p. 266:20-22 ("Q. (by Durham's counsel): Now did that surprise you that Tom directed audit emails concerning Dr. Durham to be deleted?"). This is simply false and lacks any basis in evidence. The email clearly contains a general statement about audit emails, and more importantly, contains no evidence that there was an instruction to target and delete emails related to Dr. Durham. To the contrary, the evidence in the case is that (1) Tom Florence directed ARPC employees to practice routine and standard corporate hygiene and not hold on to "a bunch of old reports that had been superseded by new reports", (2) that the direction had nothing whatsoever to do with Dr. Durham or the Durham-related audits which would not be completed for years, and (3) that Ankura produced tens of thousands of documents (including the email in question) related to the Durham audit precisely because what Dr. Durham claims happened did not.  *Id*. at p. 269:2-270:3.

To the extent the anticipated testimony would have any probative value (it does not), it should be excluded under *Fed. R. Evid. 403* because its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Dr. Durham clearly wants to try a grand conspiracy case without any actual evidence. Allowing unfettered use of a document that has the words "email" and "deleted" when Dr. Durham and his counsel have a proven track-record of warping the plain language of documents is dangerous and serves to allow Dr. Durham to create unfair prejudice, confusion of the issues, and will mislead the jury. Ankura has produced thousands and thousands of pages of documents in this case, yet his goal is to toss this one email in front of the jury in hopes of invoking conspiratorial leanings. Dr. Durham is not concerned about proof. He just wants an opportunity to sling and twist conspiracy theories and hope it lands on a claim.  This is entirely improper and is rife with danger of prejudice, confusion, and misleading the jury.

**15.** **Testimony, evidence, references, or argument related to alleged 2006 deposition testimony given by Dr. Andrew Ghio in an entirely separate lawsuit.**

Ankura anticipates that Dr. Durham will attempt to introduce testimony, evidence, references, or argument regarding 2006 deposition testimony given by Dr. Andrew Ghio in an entirely separate lawsuit. *See* Ex. M, at ¶ 10 ("I know that Ankura intentionally selected biased doctors to participate in my audit. For example, I have read where Dr. Ghio revealed in his sworn testimony in his deposition March 14, 2006, in the case of Edward A. Adams, Sr. vs. Acands on page 68 and page 75, that he believes each state in the USA can only have 20 cases per year of Pulmonary Asbestosis.")

Dr. Ghio is a board-certified pulmonologist at Duke University. Pertinent to this case, he reviewed a sub-set of claims relying on an x-ray read from Dr. Durham that had already been

reviewed by Dr. David Pearse. He did not review all 98 claims in the Durham medical audit. Additionally, Dr. Ghio is an employee of neither Ankura nor the Trusts. And, while Dr. Durham seems to believe Dr. Ghio is biased and that alleged bias helps his case, Dr. Durham chose **not** to depose Dr. Ghio. Instead, he has elected to cherry pick a brief excerpt from Dr. Ghio's deposition in a wholly unrelated matter and offer his (Dr. Durham's) own opinions as to Dr. Ghio's bias and what he meant by his testimony. There is absolutely no evidence, moreover, that Ankura was aware of Dr. Ghio's deposition testimony when he was retained (by the Trusts) to participate in the audit of Dr. Durham, or that the Trusts relied on any information from Dr. Ghio when deciding to no longer accept medical evidence from Dr. Durham.

If Dr. Ghio does not testify at trial, his testimony in an unrelated lawsuit from almost sixteen (16) years ago is hearsay.[8] *See Fed. R. Civ. P.* 801(d)(1). And, if he does not testify, the rules of unavailability afford Dr. Durham no relief to admit Dr. Ghio's former testimony. *See Fed. R. Civ. P.* 804. While Rule 804(b) provides a vehicle for admitting former testimony "whether given during the current proceeding or a different one," the Rule requires that the party against whom the former testimony is being offered "had –, or in a civil case its predecessor in interest had – an opportunity and similar motive to develop it by direct, cross, or redirect examination." *Fed. R. Civ. P.* 804(b)(1)(A)-(B). In this case, Dr. Durham would like to offer the former testimony against Ankura. But Ankura was not a party to the proceeding in which Dr. Ghio testified, and thus, had no opportunity and/or similar motive to develop the testimony by any means of examination. Therefore, unless Dr. Ghio testifies in this trial, his deposition testimony from a separate lawsuit in 2006 is not admissible, and Dr. Durham, his witnesses, and his counsel should be prohibited from introducing testimony, evidence, references, or argument regarding alleged

---

[8] Even if Dr. Ghio testifies as trial, his former testimony may still be hearsay, and Ankura waives no argument in this regard. Dr. Ghio's prior testimony would still have to satisfy Rule 801(d)(1).

17319729.52

2006 deposition testimony given by Dr. Andrew Ghio in an entirely separate lawsuit, especially as it cannot be established that Ankura even had knowledge of such testimony.

16.    **Testimony, evidence, references, or argument regarding an alleged incident in which an individual committed suicide upon learning they had been diagnosed with asbestos-related lung disease.**

Dr. Durham is expected to testify regarding an incident in which an individual allegedly committed suicide after receiving a letter from a law firm in which they were informed of a diagnoses of asbestos-related disease. Specifically, when asked whether he would ever say "that somebody has evidence of asbestos-related disease, even if they didn't," Dr. Durham responded:

> I would never do that …. I actually heard of a time when one of another B-readers read one like that, they get these letters from the law firms that say, you've got asbestos in your lungs, and all they see is these commercials on TV. And I heard, I can't prove it, but that one person committed suicide when they got that letter from the … law firm, and I would never do that ….

Ex. A p. 515:7-516:6

While he can obviously deny intentionally reading the x-rays of healthy lungs positive for asbestos-related disease, Dr. Durham should be precluded from testifying regarding the alleged suicide that resulted from such conduct. Dr. Durham's testimony regarding that matter demonstrates that he lacks personal knowledge of such an incident and that he is conveying hearsay. Indeed, Dr. Durham expressly admits that he "heard" about this incident and he "can't prove it." Accordingly, such testimony is blatantly inadmissible. *See Fed. R. Evid.* 602, 801, & 802.

17.    **Testimony, evidence, references, or argument from a non-expert regarding the sufficiency of the sample size of the audit of Dr. Durham.**

Dr. Durham and his witnesses have often opined that the sample size used in Ankura's audit of Dr. Durham was insufficient. Ex. F, at ¶ 10 ("As such, the 44 chest x-rays seems like a relatively small sample to attempt to judge Dr. Durham's representative work as a B-Reader over

the years for a good number of experienced law firms."); Ex. H, at ¶ 23 ("While I do not have a strong background in statistics, I would think the sample size should be much larger ...."). Not only do these witnesses often misrepresent the scope of Ankura's multiple audits, neither Dr. Durham, his witnesses, nor his experts are qualified to offer such opinion testimony (nor has any expert been designated to offer such testimony). Tacitly acknowledging that such testimony is, in fact, opinion testimony, Dr. Durham's witnesses nonetheless suggest that they can offer such testimony because it is matter of "common sense." These witnesses are simply wrong.

Testimony about the sufficiency of the sample sized used to audit Dr. Durham is opinion testimony that only a qualified witness with relevant expertise in statistics can offer. Neither Dr. Durham nor any of his witnesses has such expertise. Ankura, however, has retained an expert who is qualified to render such an opinion, Dr. Abraham Wyner. Dr. Wyner has a degree in mathematics from Yale University and a Ph.D in statistics from Stanford University. He is a Professor of Statistics at University of Pennsylvania's Wharton School. According to Dr. Wyner, Dr. Durham and his witnesses' "common sense" argument is incorrect. Specifically, Dr. Wyner opined that "[i]n addition to the 44 claimants whose x-rays were sent to Dr. Durham for additional qualitative review, Ankura reported the findings of three quantitative statistical audits: (1) Clinesmith Audit; (2) Medical Audit; and (3) External Audit .... Secondly, [Dr. Durham's expert] implies that even a random sample as small as 44 from a population of more than 6000 must be deficient. In fact, a sample of 100 or even 44 can be quite sufficient to make an accurate judgment of a population of claims of any size provided that the sample is random and unbiased." *See* Report of Dr. Abraham Wyner, attached as **Exhibit W**, at ¶¶ 5 & 42.

Any testimony or evidence regarding the statistical sufficiency of the audit of Dr. Durham must come from a qualified witness – an expert. Testimony from witnesses who do not have

17319729.52

expertise in statistical analysis, such as from Dr. Durham, his experts, and/or his fact witnesses, should be excluded, especially when such testimony is uninformed and inaccurate.

18.  **Testimony, evidence, references, or argument regarding investigations into the Trusts by the United States Department of Justice, state Attorneys General, the Federal Bureau of Investigation, the Central Intelligence Agency, etc. and/or any alleged communications by Dr. Durham with representatives of such or similar governmental entities.**

It is anticipated that Dr. Durham may attempt to comment regarding investigations into the Trusts conducted by governmental entities, including the United States Department of Justice and/or various state Attorneys General. Dr. Durham may also attempt to testify that he contacted the Federal Bureau of Investigation and/or the Central Intelligence Agency regarding the Trusts' decision to no longer accept his medical reports. Dr. Durham should be precluded from commenting on all such issues. Unrelated investigations into the Trusts, which are not parties to this litigation, by the United States Department of Justice or state Attorneys General are irrelevant and immaterial to this litigation. Dr. Durham's alleged communications with the FBI and/or the CIA are likewise irrelevant, and any commentary or response by those organizations would be inadmissible hearsay. *See Fed. R. Evid*. 801 & 802.

19.  **Testimony, evidence, references, or argument related to an alleged scandal involving B-readers in which a company was allegedly paying for negative b-reads, as reported in an article from Johns Hopkins University, Black Lung Scandal Unit.**

Dr. Durham has made reference to an article from Johns Hopkins University, Black Lung Scandal Unit, which (allegedly) included a report about a company that had paid B-readers for negative x-ray reads of its employees.[9] To be clear, neither Ankura, the Trusts, nor any of the medical experts retained by the Trusts were in any way involved in the incident allegedly reported

---

[9] The Johns Hopkins University article was not made an exhibit to any deposition in this matter nor was it attached as an exhibit to any pleading, motion, or other filing.

upon in the Johns Hopkins University article. Accordingly, Dr. Durham would offer this evidence only to suggest that, because one company allegedly paid B-readers to read x-rays negative, the medical experts retained by the Trusts might also be so motivated.

Dr. Durham should be precluded from offering such evidence. Setting aside the fact that the Trusts are liquidating trusts that exist solely to pay legitimate claims and do not share a corporation's profit motive, the Johns Hopkins University article, and any testimony from Dr. Durham regarding the content of the article, is hearsay. *See Fed. R. Evid.* 801 & 802. Second, testimony that an unrelated company allegedly paid B-readers for negative x-ray reads is irrelevant and immaterial to this litigation. *See Fed. R. Evid.* 401. Further, any probative value of such evidence would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See Fed. R. Evid.* 403.

> **20.      Testimony, evidence, references or argument that Dr. Durham's expert, Ralph Summerford, was on one occasion retained by Balch & Bingham LLP.**

Ankura anticipates that Dr. Durham will attempt to elicit testimony that his expert, Ralph Summerford, has been retained on a prior occasion by Balch & Bingham, LLP, legal counsel to Ankura in this action. While it is true that Mr. Summerford was an expert witness in a case handled by Balch & Bingham LLP (he was actually hired by prior counsel in that case but remained in the case when Balch & Bingham LLP replaced the counsel that hired him), that fact is wholly irrelevant to these proceedings and such testimony would be unfairly prejudicial to Ankura. Dr. Durham, his counsel, and/or his expert, Mr. Summerford, should therefore be precluded from disclosing the same to the jury.

> **21.      Testimony, evidence, references, or argument regarding offers of settlement, or the lack thereof.**

Offers of settlement or compromise are specifically excluded from evidence by *Fed. R.*

*Evid.* 408(a), which states: "[e]vidence of the following is not admissible – on behalf of any party – either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction: …. (1) furnishing, promising, or offering – or accepting, promising to accept, or offering to accept – a valuable consideration in compromising or attempting to compromise the claim; and (2) conduct or a statement made during compromise negotiations about the claim …." As evidence of offers of settlement or compromise, or the lack thereof, are expressly rendered inadmissible under Rule 408(a), Dr. Durham and/or his counsel should be precluded from making reference to the same in the trial of this action.

22. **Any testimony or other evidence from an expert who was not timely disclosed, including testimony or other evidence from a new expert and/or testimony from an existing expert that is consistent with or that purports to supplement prior timely expert disclosures.**

Ankura moves to exclude in limine any testimony or other evidence from an expert witness who was not disclosed in accordance with the *Federal Rules of Civil Procedure* or the Local Rules of this Court, and/or which constitutes new opinion testimony or other evidence. Dr. Durham has, in fact, submitted supplemental expert reports on behalf of each of his witnesses. Ankura has moved to strike each as untimely and improper under the Federal Rules of Civil Procedure and the Local Rules of this Court.[10] As explained in those motions, *Fed. R. Civ. P.* 26(e)(1)(A) requires that supplementation or correction of a prior expert disclosure be done in a "timely manner" and the rule does not permit for an out-of-time supplement to an expert report. Moreover, Rule 26(a)(5) of the Local Uniform Civil Rules imposes a duty upon a party to supplement discovery "at appropriate intervals under *Fed. R. Civ. P.* 26(e) and in no event later than the discovery deadline established by the case management order. *See L. U. Civ. R.* 26(a)(5); *see also Buxton v. Lil' Drug*

---

[10] Ankura adopts and incorporates its motion to the strike the supplemental expert reports of Ralph Summerford, Dr. Kenneth D. Krone, and Dr. Bill Brister as if fully set forth herein.

*Store Products, Inc.*, 2007 WL 2254492, at *5 (S.D. Miss. Aug. 1, 2007) (recognizing the implication of this local rule, this Honorable Court noted that "[a] party is under a duty to supplement disclosures at appropriate intervals pursuant to Fed. R. Civ. 26(e) *and in no event later than the discovery cut-off established by the scheduling order*." (emphasis in original)).

Accordingly, any expert testimony that was not timely disclosed or that is inconsistent with or that purports to supplement the timely disclosures of Dr. Durham's experts, Ralph Summerford, Dr. Kenneth Krone, and Dr. Bill Brister, should be excluded at trial.

### 23. An expert from "parroting" the opinion of another expert.

Ankura anticipates that Dr. Durham's experts will attempt to adopt opinions of other experts as their own. While an expert can rely on the opinions of other experts, "he may not simply restate the opinion of another expert." *Mallard v. Colonial Life & Acc. Ins. Co*., 326 S.E.2d 6 (Ga. 1985). "Parroting" occurs when an expert tries to pass off the opinions of another expert as his own. *See Abrams v. Cibra Specialty*, 2010 WL 779283 at *4 (S.D. Ala. Mar. 2, 2010) (explaining that "parroting" occurs when an expert acts "as a mere conduit for [another expert's] opinions, passing off the opinions of that undisclosed expert as his own even though they admittedly are outside his ken."). The parroting rule also applies when an expert in one field holds himself out as an expert in the other field based solely off the data of another expert. *See Deautze Corp. v. City Light & Power, Inc*., 2009 WL 2986415 at *6 (N.D. Ga. March 21, 2009) (*citing Larson v. Kempker*, 414 F.3d 936, 941 (8th Cir. 2005) (holding that "an expert may extrapolate from data supplied by other experts …, but a person does not become an expert simply by reviewing an expert's reports or research."). Thus, "an expert may use information provided by [others] as a basis for his opinions if (1) experts in the particular field would reasonably rely on such information, and (2) the expert does more than parrot the information provided to him." *Remy, Inc.*

*v. Tecnomatic, S.P.A.*, 2012 WL 5159997, *3 (S.D. Ind. Jan. 25, 2012). He must be able to testify as to the veracity of the work. *Wisconsin v. Indivior, Inc.* (*In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*), 2020 WL 6887885, *5 (E.D. Pa. Nov. 24, 2020). Ultimately, an expert cannot simply be the "mouthpiece" of another expert. *King-Indiana Forge, Inc. v. Millennium Forge, Inc.*, 2009 WL 31876685, *2 (S.D. Ind. Sep. 29, 2009). As such, Dr. Durham's experts should be precluded from this practice at the trial of this case.

24. **Any reference to punitive damages should be excluded unless and until a second phase of trial is warranted.**

Dr. Durham seeks recovery of punitive damages against Ankura. Pursuant to statute (Miss. Code Ann. § 11-1-65 (as amended)), claims for punitive damages in Mississippi are subject to a bifurcated trial. Until such time as Dr. Durham is able to prove, through clear and convincing evidence, which Ankura denies, a level of culpability on behalf of Ankura warranting a second phase of trial for punitive damages, Dr. Durham, his witnesses, and his counsel, should be precluded from mentioning, arguing, or otherwise suggesting that Dr. Durham is entitled to recovery of punitive damages.

25. **Any reference to the size or perceived corporate wealth of Ankura, including referencing that Ankura is a company with offices across the world.**

The Court should prohibit any reference by Dr. Durham, his witnesses, or counsel to the size or perceived corporate wealth of Ankura, including any reference to the fact that Ankura has offices throughout the world. Such references are irrelevant to any issue before the Court, and any slight probative value of evidence of Ankura's size and perceived wealth may have is substantially outweighed by the risk of confusion of the issues, misleading the trier of fact, and unfair prejudice to Ankura pursuant to Rules 401, 402 and 403 of the *Federal Rules of Evidence*. *See Emmerich Newspapers*, 2022 WL 4360570, at *5 (statement that "could inflame the prejudices of the jury by

pitting a 'small town' Mississippi company against a large out-of-state corporation" inadmissible under *Fed. R. Evid.* 401-403); *Western Union Tel. Co. v. Cashman*, 132 F. 805, 808 (5th Cir. 1904) ("the court admitted evidence showing the great corporate wealth of the defendant .... As there was no evidence in the case warranting the jury to award more than compensatory damages, the evidence in question was improperly admitted."); *Garth*, 2021 WL 4860466, at *3 (the "financial status of the litigants is irrelevant" when punitive damages are not at issue); *Progressive Cas. Ins. Co. v. Keys*, 317 So. 2d 396, 399 (Miss. 1975) ("The testimony introduced by the plaintiff to show the net worth of the defendants was inadmissible, and the objection thereto should have been sustained."); *Affordable Care, LLC v. JNM Office Property*, LLC, 2022 WL 291716, at *3 (S.D. Miss. Jan. 31, 2022) (evidence of "either party's comparative wealth or status" inadmissible); *Fowler v. State Farm Fire & Cas. Co.*, 2008 WL 3050417, *2–3 (S. D. Miss. July 25, 2008) ("Any evidence regarding State Farm's net worth would only be admissible in any second phase of trial ....").

> **26.   Any reference to the amount paid by Ankura to purchase ARPC, the amount the principals of ARPC were paid related to that purchase, and/or the salary and bonus amounts of the Ankura employees who will testify in this case.**

Ankura anticipates that Dr. Durham will attempt to introduce evidence regarding the amount Ankura paid to purchase ARPC and/or the amount the principals of ARPC were paid related to that purchase. Ex. N, pg. 87 ("they were the two principals that owned ARPC, that Ankura paid $50 million for in 2015, end of '15, early '16 ...."). Ankura further anticipates that Dr. Durham will attempt to introduce evidence regarding the compensation, including salary and bonus amounts, paid to the Ankura employees who will testify in this case. *Id.* at 100-01.

The audit of Dr. Durham began in late 2014. At that time, the Trusts had a contract with a company known as ARPC to perform auditing services for the Trusts. In April 2016, Ankura

purchased ARPC and assumed responsibility for performing auditing services for the Trusts. After that date, the individuals who were performing auditing services for the Trusts, including several who are witnesses in this case, became employees of Ankura.

Neither the amount paid by Ankura to purchase ARPC, nor the salary and bonus amounts of Ankura's employees, are relevant to this lawsuit. Those issues have no probative value to any triable issue, including the issue of malice. ARPC was a business advisory and expert services firm with over 90 employees and 40 years of experience assisting law firms, corporations, and governments with complex legal and business challenges. The purchase price of such an entity should be expected to be significant. Likewise, the employees of Ankura are highly educated, qualified, and experienced. Their compensation is commensurate with their abilities and experience in the market in which they work. Notably, the compensation of Ankura's employees was in no way tied to the Trusts' decision to no longer accept medical evidence from Dr. Durham or to the financial performance of the Trusts in general (which are liquidating trusts that lack a profit motive anyway). Accordingly, evidence regarding such matters, which Dr. Durham would seek to admit for no reason other than to prejudice the jury against Ankura, should be excluded. *See Fed. R. Evid.* 402 & 403; *Garth*, *supra*; *Fowler*, *supra*; *Affordable Care*, *supra*; *LeBoeuf v. K-Mart Corp.*, 888 F.2d 330, 333-34 (5th Cir. 1989) (agreeing with district court that "evidence showing that a store managers' bonus was related to the store's profits" was inadmissible).

### 27. Testimony, commentary, argument, or reference to Ankura's possible absence of a corporate representative.

Ankura has not decided at this time whether a corporate representative of the company will be present at the trial of this action. However, in the event Ankura proceeds to trial without a formal corporate representative, Dr. Durham and his counsel should be precluded from referencing or making arguments regarding the absence of such a corporate representative. *Affordable Care,*

*LLC*, 2022 WL 291716, at *3 ("The presence or existence of Affordable's corporate representative is completely divorced from any relevant issue of fact and is otherwise subject to Rule 403. This portion of Affordable's Motion *in limine* will be granted."); *Hankins v. Ford Motor Co*., 2012 WL 174793, at *10 (S.D. Miss. Jan. 20, 2012 ("In our case, counsel for Hankins may not comment on the absence, if any, of Ford's corporate representative before and during the liability phase.").

> **28.    Commentary, reference, or argument by Dr. Durham's counsel that purports to place this case in context with others throughout his career and/or that constitutes personal commentary on the evidence.**

Dr. Durham's counsel repeatedly made statements at the summary judgment hearing that purports to place this case in context with others throughout his career and/or constitutes personal commentary about the evidence. *See* Ex. N at p. 34 (this is the "most egregious case I have ever seen by a civil defendant"); *id.* at 35 ("[a]nd let me tell you why this is such an egregious case."); *id.* at 44 ("[a]nd that's why I said this is so egregious"); *id.* at 47 ("that's despicable"); *id.* at 48 ("this was awful. That's why I say this is so egregious"); *id.* at 50 ("that's appalling to me"); *id.* at 50; ("That's why I say, Your Honor, this case is so egregious."); *id.* at 64 ("I think that's horrendous."); *id.* at 67 ("It was awful what they did to him."); *id.* at 79 ("…. Your Honor, it's just – it's awful."); *id.* at 85 ("Your Honor, it's despicable how laxed they were about protecting the rights of Dr. Durham.").

While Dr. Durham's counsel will obviously be allowed to make arguments to the jury at the trial of this action, statements of the type cited above go well beyond what is proper argument, particularly to the extent Dr. Durham's counsel purports to comment on this case in the context of other cases he has had throughout his career and/or to the extent he is offering personal commentary based on his experience as a lawyer.  In essence, through the aforementioned statements, Dr. Durham's counsel is going beyond his role as legal counsel and is himself

becoming a witness. Accordingly, Dr. Durham's counsel's gratuitous statements about how he feels about the (alleged) evidence, particularly when given in the context of other cases he has handled, is inappropriate and should be excluded.

Respectfully submitted, this 9th day of December, 2022.

ANKURA CONSULTING GROUP, LLC

BY:    BALCH & BINGHAM LLP

*/s/ K.C. Hightower*
Of Counsel

K.C. Hightower (MSB# 101246)
Katie Hood (MSB# 104659)
Jake Lambert (MSB# 104254)
John G. Smith (*Pro Hac Vice*) (ASB-8146-T68J)
Lane Knight (*Pro Hac Vice*) (ASB-6748-I72K)
BALCH & BINGHAM LLP
1310 Twenty Fifth Avenue
Gulfport, MS 39501
Telephone: (228) 864-9900
Facsimile: (228) 864-8221
kchightower@balch.com
khood@balch.com
jlambert@balch.com
jgsmith@balch.com
lknight@balch.com

17319729.52

**CERTIFICATE OF SERVICE**

I, the undersigned counsel, do hereby certify that I have this day served a true and correct copy of the above and foregoing document to all counsel of record registered with the ECF system via the electronic filing system.

This the 9th day of December, 2022.

/s/ K.C. Hightower
Of Counsel

17319729.52