**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**EASTERN DIVISION**

**WILLIAM H. DURHAM, M.D.**                                                    **PLAINTIFF**

**VERSUS**                                    **CAUSE NO.: 2:20-CV-112-KS-MTP**

**ANKURA CONSULTING GROUP, LLC**
**and JOHN DOES 1-5**                                              **DEFENDANTS**

---

**MEMORANDUM IN SUPPORT OF PLANTIFF'S MOTION TO ALTER OR AMEND**
**ORDERS GRANTING SUMMARY JUDGMENT and DENYING RECONSIDERATION**
**OF DISMISSAL OF NEGLIGENCE CLAIM**

COMES NOW, the Plaintiff, WILLIAM H. DURHAM, M.D. by and through

undersigned counsel, Norman Pauli and submits this, his Memorandum in Support of [Doc.___]

Plaintiff's Motion under Rule 59(e) to Alter or Amend Orders Granting Summary

Judgment on the Tortious Interference Claims [Doc.304] *and* Denying Reconsideration

under Rule 54(b) of an Order Granting the Motion to Dismiss the Negligence Claim

[Doc.307]. In support thereof, Dr. Durham would show unto the Court that the instant

motion to alter or amend should be granted for the following reasons, to-wit:

**Standard of Review Under Rule 59(e)**

A Rule 59(e) motion calls into question the correctness of a judgment or order.

There are three grounds for altering or amending them:

(1) an intervening change in controlling law,

(2) the availability of new evidence not previously available, or

(3) the need to correct a clear error of law or prevent manifest injustice.

*See Williamson Pounders Architects, P.C. v. Tunica Cnty., Miss.*, 681 F.Supp.2d 766, 767

(N.D. Miss. 2008).  There are two important imperatives relating to such a motion:

1.  Need to bring litigation to an end; and

2.  Need to render just decisions on the basis of all the facts.

The task for the district courts is to strike the proper balance between these competing

interests. See *Templet v. HydroChem*, Inc. 367 F.3d 473, 479 (5th Cir. 2004) citing

*Lavespere v. Niagara Mach & Tool Works*, 910 F.2d 167, 174 (5th Cir. 1990) (reversed

on other grounds).

## I.

### The Motion for Summary Judgment was Granted in Error.

1.     On December 12, 2022, the Court entered an Order [Doc.304] granting

Defendant's Motion for Summary Judgment [Doc.202] on Plaintiff's alternative claims

of Tortious Interference with Verbal Contracts and/or Business Relations of an ongoing

successful business that Dr. Durham had with a number of known law firms.  These firms

undeniably regularly hired Dr. Durham over the years, especially in or about 2018, to

provide screening ILO chest x-ray reports for potential asbestos claimants represented by

his law firm business associates, medical reports of physical exams he performed on

claimants with positive findings on x-ray consistent with asbestosis, and cancer link letter

reports for claimants with positive pathology findings following tissue biopsies for one of

the qualifying cancers causally connected to asbestos exposure, Dr. Durham's work for

the law firms continued until Ankura caused or was a proximate cause of notification

letters being sent to Dr. Durham and his law firm business associates, thereby causing

catastrophic economic damages to Dr. Durham's B-Reader Business.  It was not even

disputed that once the two notification letters went out that it was foreseeable that the law

firms would no longer hire Dr. Durham and he would have to stop working as a B-reader,

i.e., the intended result.  See **EXHIBIT "1"** hereto, a copy of said Order Granting

Summary Judgment [Doc.304].

2.      To prevail on a claim for tortious interference with contract, a plaintiff must show

"(1) that the acts were intentional and willful; (2) that they were calculated to cause

damage to the plaintiffs in their lawful business; (3) that they were done with the

unlawful purpose of causing damage and loss, without right or justifiable cause on the

part of the defendant (which constitutes malice); and (4) that actual damage and loss

resulted." *Par Indus. v. Target Container Co.*, 708 So. 2d 44, 48 (Miss. 1998) (citing

*Cenac v. Murry*, 609 So. 2d 1257, 1268-69 (Miss. 1992)). The elements of tortious

interference with business relations are essentially the same. *See Galloway v. Travelers

Ins. Co.*, 515 So. 2d 678, 682-83 (Miss. 1987) (listing elements of tortious interference

with business). Implied within the elements of these torts is the requirement that a

plaintiff must show "that the defendant's acts were the proximate cause of the loss or

damage suffered by the plaintiff." *Scruggs, Millette, Bozeman, & Dent, PA v. Merkel &

Cocke, PA*, 910 So. 2d 1093, 1099 (Miss. 2005).

3.      In granting summary judgment on these claims, the Court found that Dr. Durham

could not show intentional acts calculated to harm him on Ankura's part. (Mem. Op. at

23-26). The Court further found that Dr. Durham failed to produce evidence that

Ankura's acts proximately caused his losses.  **EXHIBIT "1,"** Mem. Op [Doc.304] at 27-29.

4.      As to the causation element, the Court found that Ankura's acts could not be a proximate cause of Dr. Durham's losses because the Trusts (not Ankura) held the ultimate authority to ban Dr. Durham from submitting reports. The Court also pointed to an Audit Committee that supposedly stood between Ankura and the Trusts with regard to disqualifying Dr. Durham.

5.      Proximate cause is that "which in natural and continuous sequence unbroken by any efficient intervening cause produces the injury and without which the result would not have occurred." *Grisham v. John Q. Long V.F.W. Post*, 519 So.2d 413, 417 (Miss. 1988).  Cause in fact and foreseeability are the "two separate and distinct concepts" of proximate cause. *Rogers v. Sunbelt Mgmt. Co.*, 52 F. Supp. 3d 816, 827 (S.D. Miss. 2014) (citations omitted). "Cause in fact means that the act or omission was *a substantial factor* in bringing about the injury, and without it the harm would not have occurred." *Davis v. Christian Brotherhood Homes*, 957 So. 2d 390, 404 (Miss. Ct. App. 2007) (emphasis added). "Foreseeability means that a person of ordinary intelligence should have anticipated the dangers" that his or her actions created for others. *Id.*

6.      As discussed below, Ankura—particularly through its principals Tom Florence and John Brophy—dominated the decision-making processes of the Audit Committee and the Trusts themselves. Obviously, <u>had Ankura not recommended disqualification of Dr. Durham, he would not have been banned by the Trusts</u>. Thus, Ankura's actions were a cause in fact of Dr. Durham's losses. Further, it was easily foreseeable that Ankura's

4

actions would have resulted in Dr. Durham's disqualification by the Trusts given the history of influence Ankura and its principals exerted on the Trusts. The Mississippi Supreme Court has observed in a tortious interference case that "the question of causation and quantum of damages in relation to tortious conduct is a jury issue seldom amenable to summary disposition." *Nichols v. Tri-State Brick and Tile Co.*, 608 So. 2d 324, 329 (Miss. 1992).

7.     Regarding a lack of intent and calculation on Ankura's part, the plaintiff had discussed at length at the Hearing on Oral Argument that Ankura subjected Dr. Durham to an audit process which by its very design and how it was conducted was intended to disqualify him. "The element of willfulness and calculation does not require a showing on the part of the plaintiff that defendant had a *specific intent* to deprive plaintiff of contractual rights." *Liston v. Home Ins. Co.*, 659 F. Supp. 276, 281 (S.D. Miss. 1986), emphasis added.  The Court or factfinder may infer intent "when defendant knows of the existence of a contract and does a wrongful act without legal or social justification that he is certain or *substantially certain* will result in interference with the contract." *Id. (emphasis added), see also Par Indus.*, 708 So. 2d at 48 (quoting *Liston*).

8.     In this case, Ankura knew that Dr. Durham had existing contracts and business relations with the law firms for which he provided reports. Ankura would have been substantially certain that its audit results and recommendations to the Trusts would result in Dr. Durham's disqualification and cut off his business with the law firms. Thus, the plaintiff has shown the requisite elements of intent and calculation on Ankura's part.

9.     The Court may recall that during the oral arguments of October 20, 2023 on

Ankura's Motion for Summary judgment, there was a good discussion on the issue of causation between Ankura's alleged malicious audit that culminated in Ankura's Audit Team -- lead by Tom Florence and John Brophy -- recommending that Dr. Durham's medical reports no longer be accepted to the audit committee and more importantly, to the trustees of those certain nine asbestos trusts that hired Ankura to audit Dr. Durham. The discussion occurred because Ankura needed the trusts to authorize the sending out of the notification letters that tortiously interfered with Dr. Durham's business complained of herein.  Plaintiff explained that because of their strong, longstanding business history with the trustees, Ankura's Audit Team knew that the trustees would likely accept its recommendation to ban Dr. Durham's reports if it was presented to them by either Mr. Florence or Mr. Brophy.  It appears that the Court has ruled against the Plaintiff on this foreseeability issue touching on causation, whereas the discussion at oral argument seemed to have concluded with the Court accepting Plaintiff's argument that causation was a fact issue for the jury to resolve on whether it was "foreseeable" that the trustees would accept the recommendation made by Ankura's Tom Florence or John Brophy.  See **EXHIBIT "2"** hereto, a copy of the Transcript of Oral Argument of Oct. 20, 2022 at pages 85-89.

10.     The fact issue of whether the trustees would likely accept Ankura's said recommendation gets traction from the favorable inference drawn from the evidence that Mr. Florence and Mr. Brophy are well respected by these trustees.  They have had a long term relationship with the trustees, such that their respective recommendations have weight, thereby making the acceptance of Ankura's subject recommendation when

delivered by them or either of them a reasonably foreseeable outcome.  (Like "when E.F. Hutton speaks, people listen.")  The evidence shows that their business relationships with these trusts included the 15 years when Mr. Florence and Mr. Brophy were owners of ARPC performing the type of audits and claims management services for these trusts that Ankura began doing after it bought out ARPC.  In his deposition, John Brophy acknowledged that he is the Assistant Executive Director of these asbestos trusts that Ankura does work for since the buyout in late 2015 or early 2016.  Further, Mr. Brophy testified that he held the same position as Assistant Executive Director for these trusts before the buyout, when he was a partner of ARPC doing the same type work for these trusts.  See **EXHIBIT "3"** hereto, excerpt pages of Brophy depo at pages 20-22.

11.     That is, Tom Florence and John Brophy had a respected history and clout with the respective nine asbestos trusts that Ankura did work for, as shown by them being made the Executive Director and the Assistant Executive Director, respectively of all nine trusts, which is reflected on page "1" of the respective written Agreements with each of the said nine trusts.  See **EXHIBIT "4"** hereto, a collective exhibit of the excerpt first pages of the various agreements that Ankura entered into on or about May 1, 2016 with each of these nine trusts.  Each of the first pages of the agreements confirms in the second unnumbered part of paragraph 1 thereof, that Mr. Florence and Mr. Brophy were appointed the Executive and Assistant Executive Directors of the very asbestos trusts that hired Ankura to audit Dr. Durham and to whom Mr. Brophy, with Mr. Florence being present personally made the said recommendation and got these trustees to accept it thereby gaining  the expected authority to send out the subject interfering notification

letters.  The first pages are collectively:  Armstrong ACG-ID-0000674; Babcock ACG-ID-0000129; Celotex ACG-ID-0000686; Federal-Mogul ACG-ID-0000700; Flintkote ACG-ID-0000714; Owens ACG-ID-0000728; Pittsburgh Corning ACG-ID-0000742; U.S.  Gypsum 0000756; WRG 0000770.  **EXHIBIT "4"** hereto, the first page thereof.

12.     There was additional discussion that the minutes of certain trustee quarterly meetings in June 2018 support Plaintiff's argument that these trustees would readily accept the said recommendation of Ankura's Tom Florence or John Brophy to ban Dr. Durham's medical reports.  Comments were made by undersigned counsel from memory that he believed the minutes reflected that the various trustee meetings were had, which did not go into much substance on Durham's audit as suggested by the duration of the meetings being relatively short overall lasting about an hour each and given that they reflect that a number of other unrelated topics were also had to be covered.  In support of same, Plaintiff hereby attaches copies of four sets of minutes that were produced in discovery by Ankura evidencing four such trustee meetings occurring on June 12 through June 14, 2018, that document in pertinent part that the respective trustees indeed gave their authority to notify Dr. Durham (though we know that others were also notified), indicating that Mr. Brophy's recommendation must have been accepted.  Importantly, all four set of minutes reflect that Tom Florence, John Brophy and Marla Eskin were present at the meetings.  Also, in each instance Ankura's senior employee, John Brophy participated in presenting the update on Dr. Durham's audit.  Apparently he was aided by one of the trusts' attorneys, Marla Eskin, which perhaps gave Ankura more confidence that the trustees would foreseeably accept its recommendation and authorize notification

8

letters going out.  And, the precise minute entry paragraph pertinent to Dr. Durham is brief and identical for all four sets of documents.  See **EXHIBIT "5"** hereto, a collective exhibit of four sets of the Minutes of the Meetings with Trustees for Owens Corning, dated June 12, 2018 at page 2, ACG-ID-0020599; WRG dated June 12, 2018 at page 3, ACG-ID-0020607; U.S. Gypsum, dated June 13, 2018 at page 2, ACG-ID-0020603; and Babcock, dated June 14, 2018 at page 2, ACG-ID-0020597.

13.     Additionally, in support of the fact that the above minutes of the trustee meetings evidence that there was very little substance provided to the trustees before Ankura's John Brophy recommended that they ban Dr. Durham's medical reports, other than what is depicted by the timeline indicating the meetings were of relatively short duration and had a number of other items on the agenda, the Plaintiff took Ankura's 30(b)(6) deposition.  During the deposition of its designee, Amy Brockman did not identify any written reports of information about Dr. Durham's audit that had been specifically provided to the trustees for them to read, review and consider before they decided to no longer accept his medical reports for claimants.  Thus, leaving us with only the scant minutes, made Exhibits above and the argument that Plaintiff advanced at the oral argument on the motion for summary judgment on the foreseeability issue for purposes of causation that these trustees readily relied upon its vendor-Ankura, in particular Mr. Brophy and/or Mr. Florence to make the recommendation complained of herein and that the trustees just as readily accepted it, without much if any substantive inquiry, despite the grave consequences for the rights of Dr. Durham.  See **EXHIBIT "6"** hereto, excerpt pages of Ankura 30(b) Deposition of Amy Brockman at pages 45-68.

14.     In addition to the foregoing, there is testimonial evidence from Marla Eskin, one of the trust attorneys supporting the fact issue of whether it was foreseeable that the trustees would likely accept Ankura's recommendation to ban Dr. Durham's medical reports from the causation perspective between the malicious conduct of Ankura's Audit Team and the economic damages suffered by Plaintiff.  In particular, Ms. Eskin's deposition testimony helps to establish that ARPC was a vendor of many trusts prior to Ankura and that Ankura became its successor in 2016 performing the services that were previously performed by ARPC.  [Eskin Depo pages 17-19]

> "A.   The trusts entered in a contract to utilize Ankura as a vendor, yes."
>       [Page 24, lines 5-6]

> "A.   The trustees accept the recommendations from their attorneys and from their vendors.   [Page 275, lines 11-12]

See **EXHIBIT "7"** hereto, excerpt pages 17-19, 24 and 275 of Eskin deposition.

15.     Further, vendors are "independent contractors."  Per the testimony of trust attorney Marla Eskin, Ankura, like ARPC before it are vendors of the trusts.  Under Mississippi law, the hiring principal, such as the asbestos trusts under the facts of our case would not have liability for the wrongful conduct of its independent contractor [vendors].  See *Richardson v. APAC-Mississippi, Inc.*, 631 So.2d 143 (Miss. 1994), emphasis added.  Nor, did Ankura argue that the trusts and Ankura occupy a master-servant relationship in an attempt to contradict the sworn testimony of trust attorney Marla Eskin that the trusts accept the recommendations of their vendors.  And, to the extent that Ankura argued or suggested that Dr. Durham could go sue the trusts, rather than it that's a *red herring* because Ankura had previously argued to the Court that you must have an "injury in fact

that confers standing," such as beneficiaries to have standing to sue the asbestos trusts. For that position, Ankura previously cited to the Court the case of, *Mandelbrot v. Armstrong World Indus. Asbestos Pers. Injury Settlement Trust*, 618 F.App'x 57 (3rd Cir. 2015). See Ankura's Memorandum in support of its Motion to Dismiss [Doc.16] at pg 3.

16.    Given that it was foreseeable jury issue that the trustees would accept Ankura's John Brophy's recommendation to no longer accept Dr. Durham's medical reports, there is plausible causation between the malicious willful audit misconduct and the interfering notification letters that went out. And, there was no need to sue the trusts because Ankura is an "independent contractor" and not a "servant" of the hiring trusts. Nor was Dr. Durham a beneficiary of the trusts that have standing to sue them. To the extent that the Court concluded otherwise, it misapprehended the material facts, thus reconsideration is proper on this important causation issue. Thus, the Court should alter or amend its Order by denying summary judgment by finding that a genuine issue of material fact exists on whether it was reasonably foreseeable that these trustees would accept Ankura's recommendation to ban Dr. Durham's medical reports and authorize notification letters to go out.

17.    Similarly, the question arose about whether an agent can be liable for its conduct when there is a disclosed principal. That was followed by Plaintiff's discussion in the affirmative that agents can be individually liable under Mississippi law when performing a job for a disclosed principal, if the acts or omissions where done in bad faith. *Jones v. Mullen*, 100 So.3d 490 (Miss Ct. App. 2012). In the *Jones* case, a CPA was individually sued for tortious interference of contract by terminated employees of the Booneville

Housing Authority after the CPA reported the results of her fraud examination audit. Summary judgment was granted where there was no evidence of bad faith. The agent of the principal was not liable as long as she was acting within the scope of her responsibility <u>and</u> in the absence of bad faith. The plaintiff in that case did not sufficiently allege fact so as to create a genuine dispute on the element of bad faith. *Id*. at 497-498. See **EXHIBIT "2"** hereto Oral Argument Hearing Transcript at pages 109-10.

18.    Also, the allegation on the fact issue of whether Ankura intentionally reported out the false results of the x-ray audit of Dr. Durham, touching on the issue of intent and calculation, in that it was designed and conducted maliciously or in bad faith by purposefully selecting the most subtle of subtle low profusion chest x-rays that could easily be interpreted differently by Ankura's selected hired reviewing doctors, due to what NIOSH recognizes as acceptable B-Reader variability at the subtle low profusion level of 1/0 and willfully hired reviewing doctors that are not neutral, but rather are either unqualified or biased at reading conservatively and/or ultra-conservatively. Dr. Weill had failed the NIOSH re-certification test in 2009, the last time he took it and Dr. Leviton essentially admitted that he was ultra-conservative when he testified in his deposition that he B-Reads more than one minor less than other B-Readers. See **EXHIBIT "2"** hereto Oral Argument Hearing Transcript at pages 36-48.

## II.

### <u>The Motion for Reconsideration on Negligence Claim was Denied in Error.</u>

19.    On December 30, 2022, the Court next entered a Memorandum Order [Doc.307] Denying the Plaintiff's Motion for Reconsideration under Rule 54(b) [Doc.306] of an

Order Granting Defendant's Motion for Dismissal of Plaintiff's Negligence Claim

[Doc.26]. See **EXHIBIT "8,"** hereto, the said Memorandum Order [Doc.307].

As the Court correctly found, the partial grant of a motion to dismiss is an *interlocutory*

order and that under Rule 54(b) the Court may vacate an interlocutory order at any time

before a final judgment is entered as to all claims and against all parties.

20.     As mentioned in Plaintiff's Motion For Reconsideration [Doc.306], Dr. Durham

has consistently asserted a claim of negligence/gross negligence against Defendant

Ankura alleging in general that it negligently designed and conducted the x-ray audit of

him to falsely fail him in bad faith.  Likewise, Dr. Durham has consistently maintained

that he detrimentally relied upon the reporting of said false results and pled how he

changed his position/altered his course of business in 2018 after receiving copies of

notification letter reports derived from the false audit results being sued upon,

unquestionably proximately caused catastrophic economic damages to his B-Reader

business.  The beauty of the inference rule is that it requires the Court to infer that Dr.

Durham detrimentally relied upon those notices where he pled similar information, even

though he did not specifically pled the conclusory words "detrimental reliance."  Plaintiff

respectfully believes this inference should have been drawn by the Court in 2020, when it

dismissed the negligence claim.  Thus, given other recent developments Plaintiff has

availed himself of these reconsideration remedies to now hopefully bring about justice to

allow him to somehow have his day in court on this negligence claim.

21.     Moreover, but for the aforementioned grant of summary judgment that at the close

of the Plaintiff's evidence of a trial on the merits of his tortious interference claims, a

motion to allow the *pleadings to conform to the evidence of "negligence"* would have been appropriate.  With that option apparently foregone at the moment and because we have not yet had a trial, the Court under Rule 59(e) should now alter or amend its recent ruling denying reconsideration under Rule 54(b) and find rather, that it was appropriate for Plaintiff to have raised said reconsideration to essentially ask for the negligence claim to go to trial at this time.  Such a finding would be supported, given that the parties had likely expectations of going to trial anyway and the known evidence already at-hand fairly makes out a probable claim of negligence for the jury to sort out at a trial on the merits.  More so, a trial on the Plaintiff's claim of negligence would not require any new evidence nor any new witnesses (lay or expert), and the issues have already been fully flushed out in the extensive discovery taken in this case because of the significant overlap of the respective negligence and tortious interference claims.

22.     In denying Plaintiff's Rule 54(b) Motion for Reconsideration, the Court stated that it was too late for the Plaintiff to ask for relief from its earlier Order because following the grant of the motion to dismiss on the negligence claim, the Plaintiff did not seek leave to amend his complaint to allege sufficient facts to make out the allegation of detrimental reliance.  The Court also noted that later when he did seek leave to clarify tortious interference with business relations, he did not address amending the negligence claim. That is true, but there is a reasonable explanation.  Plaintiff's counsel not only believed that sufficient facts had been pled in the Amended Complaint, such as those appearing in Paragraphs 92, 66, 34, 35, 43, 94 from which an inference of detrimental reliance should have been found by the Court to get beyond a motion to dismiss.  But, more importantly,

he simply believed that he had lost on a matter of law.  With the Court's finding, "Rather, he [Dr. Durham] plainly disagreed" and its holding that he did not detrimentally rely on Ankura's report by expressly applying the case of *Arnona v. Smith*, 749 So.2d 63, 66 (Miss. 1999) ("where homeowner did not detrimentally rely on title opinion by attorney retained by buyer, their negligence claimed failed"), it did not appear that having additional facts pled or not pled would have made any difference.  Thinking it was futile because that law was against him, the Plaintiff earnestly began developing the remaining claims.  See Order on Motion to Dismiss [Doc.26] at page 15-16.

23.     The Plaintiff believes that the Court recognizes that the undersigned counsel is not afraid of good hard work.  It follows that if it had not seemed futile on the law and that cure could not be obtained by leave to plead additional facts in another complaint touching on detrimental reliance like those attested to in Dr. Durham's affidavit, the Court can rest assured that such a motion for leave would have been timely prepared and filed.  Just the same, in that Order on the Motion to Dismiss, at pages 15-16, the negligence claim was only discussed in two paragraphs.  And, it patently seemed that it just came down to the Court's application of the *Arnona* case as a matter of law and not a lack of alleged facts because no amount of pled facts were going to change the fact that Dr. Durham knows that the audit results are false and that he "plainly disagreed" with them, as the Court found.  Obviously, Plaintiff was unaware of the Court's earlier favorable holding distinguishing *Arnona* in a mobile home repossession case, where Ms. Aiken plainly disagreed with CIT's report that she was delinquent on her payments and tried to repossess it.  *See Aikens v. The CIT Group/Sales Financing Inc.*, 2007 WL

108301 (S.D. Miss. 2007). Otherwise, some sort of a motion for reconsideration or a motion for leave to amend would have been filed back then, just as it was immediately after first finding the *Aikens* decision.

24.      It is worth pointing out that looking down the road, when the Plaintiff did file a motion for leave to amend the complaint again to clarify a tortious interference of business relations claim, it was a difficult motion to get granted, something Plaintiff appreciated. Moreover, during that process, a discussion was had with Magistrate Judge Parker about Plaintiff's being allowed to preserve his right on appeal as to the already dismissed negligence claim by including it again in the Second Amended Complaint. The negligence claim was not included therein out of any disrespect for the prior Order of the Court. Then, moving even further down the road following the Court's recent grant of summary judgment, the *Aikens* case was fortuitously found. The finding of *Aikens* and realizing that equitable relief may still be available under Rule 54(b) was a considered godsend. Thus, Plaintiff respectfully filed his Rule 54(b) Motion for Reconsideration on Dismissal of the Negligence Claim, which was only recently denied without the benefit of the foregoing explanation. It is hoped that Your Honor will accept my explanation as being reasonable under the circumstances for why leave to amend or reconsideration had not been sought earlier, when considering granting this instant motion for relief.

25.      The Court on page 3 stated that it did not want to "reopen" the case. In addition to the passage of time reason addressed above, this conclusion may have come from Plaintiff's misworded reference in his motion asking for limited discovery, which would benefit from some clarification here. The Plaintiff does <u>not</u> want to "reopen" discovery

in the traditional sense, since the same lay and expert witnesses together with the evidence already adduced during discovery support both his negligence and tortious interference claims.  The thought process behind mentioning said limited discovery request was the Plaintiff merely wanted to make sure that the opinions expressed by Dr. Kenneth Krone in his expert reports and affidavit also specifically mentioned "negligence" though he does states deficiencies and omissions by Ankura to be construed as negligence, as a precaution so as to head off any objections at a trial that his testimony about Ankura's negligence, without such supplementation arguably had exceeded the scope of his disclosed opinions.  Perhaps instead, the same could be achieved by a short grant of leave allowing limited expert supplementation.  Or, the Court may have another suggestion on how to accomplish same in short order now that the purpose has been better explained.  With direction from the Court, such supplementation could be done in just a few days and this case could be ready for trial on the negligence claim at the next term of court.

26.     Next, Dr. Durham's explanation of how he detrimentally relied upon the letter notifications offered in his affidavit of August 28, 2020 was originally made Exhibit 22-2 to his Response to Defendant's Motion to Dismiss and again recently as Exhibit 305-4 to his Motion for Reconsideration.  Understandably, the important information contained in Paragraphs 7, 8 and 9 thereof were not considered by the Court at that time in 2020 for procedural reasons upon its ruling on a 12(b) motion to dismiss, since it was attached to the Response, rather than to the Amended Complaint.

7.     On June 22, 2018, Ms. Marla Eskin copied me on an email that she had sent to Sara Morris Schock, Esq. and Anthony Sakalarios, Esq. in Hattiesburg, Mississippi informing for the first time that the Trusts can no longer accept reports from me based on consultation with its experts [Ankura].  This obviously meant that Ankura's audit team had failed me on my B-Reader chest x-ray audit and they undoubtedly sent a report that Dr. Durham had failed to the Trusts, with the foreseeable expectation that the Trusts would rely on it and in turn notify both me and all the lawyers, who were known to have used my reports to support the asbestos claims of their clients.

8.     I relied to my detriment on Ankura's reporting that I had failed Ankura's chest x-ray audit of me.  Though highly embarrassed, starting that Monday morning, June 25, 2018, I began calling and notifying my contractual law firms that my reports would no longer be accepted.  I also had to cancel upcoming scheduled asbestos x-ray screenings, medical exams, and the writing of asbestos related lung cancer letters.  I had no choice but to RELY on Ankura's reporting of my failed audit results, while still believing I was treated unjustly and unfairly in many aspects.  For example, Ankura refused to identify or let me speak with their auditing two independent physicians about the subtle chest x-ray findings that they intentionally selected to audit me on, that I know from being acquainted with the NIOSH guidelines literature show subtle findings that are at low enough levels to be considered within acceptable B-Reader interpretation variability.

9.     About three (3) months later in September 2018, some of the attorneys who I had done business with for many years began calling me to inform that they had received letter notifications confirming what I had already told them about my failing Ankura's audit and as a result, my x-ray reports were no longer being accepted by the Trusts.  The mass email sent letters also notifying them that my physical exam reports would no longer be accepted, even though I was never audited as an internal medicine doctor on my ability to perform a patient's physical exam.  I obtained a copy of the notification letter from Ankura that globally went out to all of my Mississippi attorneys and law firm clients.  It is dated September 21, 2018 and addressed to Mr. Brett Robinson, who is a partner in the Laurel, Mississippi firm of Hortman Harlow Bassi Robinson & McDaniels, PLLC.  The letterhead states:  Participating Trust Audit Team, 1220 19th Street, NW, Suite 700, Washington, DC  20036 and the letter is likewise signed, Participating Trust Audit Team.  However, when I googled the sender's physical address, it came back with ZoomInfo directory's listing for John Brophy, Ankura

Consulting Group LLC, 1220 19th., NW Ste. 700. Washington, D.C., District of
Columbia, 20036, United States.  Thus, in furtherance of Ankura's tortious
interference of my verbal contracts with my longstanding lawyer clients, Ankura
directly contacted lawyers in Mississippi that it knew had used my professional
asbestos related medical services.   I am attaching a copy of a photo screen shot of
Ankura's listing at that physical address in Washington, D.C.

[Doc.22-3]

However, the case was in a different posture with a Rule 54(b) motion before the Court,
and the Court was not constrained to not to consider matters outside the amended
complaint.

27.     Rule 54(b)'s objective in favor of accomplishing justice is broader.  The rule's
inclusion of the phrase, when justice requires, allows the Court to consider this otherwise
pertinent affidavit of Dr. Durham at this juncture, when revisiting the issue of his
negligence claim without regard to the fact that his affidavit had been affixed to his first
responsive pleading, rather than to the amended complaint.  At this stage, the Court
should consider the facts attested in Dr. Durham's affidavit touching on "detrimental
reliance" by finding under the current Rule 59(e) motion that form over substance has no
place under Rule 54(b).  In making a decision on what does justice require, the Court is
aided by the fact that the sworn information provided in Dr. Durham's affidavit at
paragraphs 7, 8 and 9, recited above have the added advantage of being true, has not been
contradicted by extensive discovery and is wholly consistent with the pled allegations of
the Amended Complaint at [Doc.12] at ¶¶ 92, 66, 34, 35, 43, 94 and the Ad Damnum
Clause on how he clearly detrimentally relied on the two notice letters by changing his
position in business, suffering extreme financial losses by stopping work and exercising

19

forbearance by not pursuing collection for unpaid outstanding invoices on four identified

law firms for past completed reports fully performed back in 2017.

28.     Thus, at this stage under Rule 59(e), the salient questions for the Court are:

> (1)  If the additional facts stated in paragraphs 7, 8 and 9 of Dr. Durham's affidavit alleging detrimental reliance taken together with paragraphs 92, 66, 34, 35, 43, 94 of the Amended Complaint [Doc.12] would have been enough for the Court to have originally denied a motion to dismiss on the negligence claim, then why not consider them now under the broader scope of Rule 54(b) to bring about justice for Dr. Durham?

> (2)  And, if a motion for leave to amend to add those said additional facts would have been originally granted because the negligence claim had not been dismissed with prejudice, then why not construe Plaintiff's instant efforts to save his negligence claim as a *motion ore tenus* for leave to amend now to do justice?

An affirmative answer by the Court would be consistent with the notion that our courts

exist to provide a forum in favor of holding jury trials on civil cases with genuine

disputes of material contested facts, as opposed to disposing of cases via dispositive

motions.

29.     In an analogous case, where an expert report was not made an exhibit to plaintiff's

opposition to a motion for summary judgment which was granted and where the district

court had denied a Rule 54(b) motion for reconsideration of an interlocutory order

denying him a requested surreply to supplement the record, the case was reversed in part

and remanded.  Upon remand the district court was informed that it should construe the

procedural rules towards resolving the case on the merits and avoiding any dismissal on a

technicality.  That Fed. R. Civ. P. 1 requires the Rules to be "construed, administered,

and employed by the court…. to serve the just, speedy, and an expensive determine of

every action and proceeding."  See *Austin v. Kroger Texas, L.P*., 864 F.3d 326, 337 (5th Cir. 2017), citing *Krupski v. Costa Crociere S. p. A*., 560 U.S. 538, 550, 130 S.Ct. 2485, 177 L.Ed.2d 48 (2010) (noting that the Federal Rules of Civil Procedure express a general preference for "resolving disputes on their merits"); *Edwards v. Occidental Chem. Corp*., 892 F.2d 1442, 1445 (9th Cir. 1990) ("[T]he 'principal function of procedural rules should be to serve as useful guides to help, not hinder, persons who have a legal right to bring their problems before the courts,' and 'decisions on the merits are not to be avoided on the basis of mere technicalities.'" (quoting *Schiavone v. Fortune*, 477 U.S. 21, 27, 106 S.Ct. 2379, 91 L.Ed.2d 18 (1986)).

30.     At this Rule 59(e) alter/amend/reconsideration juncture, the Court should now vacate its grant of summary judgment on the tortious interference of verbal contracts and/or business relations claims, and now grant the Plaintiff's Motion for Reconsideration on the Negligence Claim because justice so requires relief from those Orders, and for all general relief to which Plaintiff is entitled.

RESPECTFULLY SUBMITTED, this 9th day of January, 2022

WILLIAM H. DURHAM, M.D., Plaintiff

By:     *s/Norman W. Pauli, Jr.*
                Norman W. Pauli, Jr.
                Attorney for Plaintiff

Norman W. Pauli, Jr. (MSB#4064)
PAULI LAW FIRM
Post Office Box 6
Hattiesburg, MS 39403
(601) 545 - 7624

21

(601) 545 - 1177 fax
npauli@paulilaw.com


CERTIFICATE OF SERVICE

The undersigned hereby certifies that he has this day served the foregoing by having electronically filed the above and foregoing Motion with the Clerk of the Court using the CM/ECF system which sent notification of such to the following counsel of record:

K.C. Hightower, Esq.
Katie Hood, Esq.
Jake Lambert, Esq.
Balch & Bingham, LLP
1310 Twenty Fifth Avenue
Gulfport, MS  39501-1931
kchightower@balch.com
khood@balch.com
jlambert@balch.com

John Garland Smith, Esq.
Griffin Lane Knight, Esq.
Balch & Bingham, LLP
105 Tallapoosa Street, Suite 200
Montgomery, Al  36104
jgsmith@balch.com
lknight@balch.com

This _____th day of January, 2022

s/Norman W. Pauli, Jr.
NORMAN W. PAULI, JR.